UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

MARC A. STARR,

    Mr. Starr,

    - against -

FIRSTMARK CORP.,

    Defendant.

---x

: CV 12 4023 Civ. ( )

: COMPLAINT

FEUERSTEIN
TOMLINSON, M.J.

1.     Marc A. Starr ("Mr. Starr" or "Plaintiff"), by and through his attorneys, Katten Muchin Rosenman LLP, for his Complaint against Firstmark Corporation ("Firstmark" or "Defendant") states as follows:

## NATURE OF THE ACTION

2.     This is an action for a temporary restraining order ("TRO") and an injunction preventing Defendant from enforcing a very narrow dispute resolution process that does not address Mr. Starr's broader claims against Defendant for fraud and for a breach of the covenant of good faith and fair dealing, perpetrated by Defendant against Mr. Starr for the sole purpose of depriving him of the negotiated purchase price for the sale of Centroid, Inc. ("Centroid"), the company built by the Starr family over two generations. As set forth below, Defendant purchased Centroid from Mr. Starr with the express promise to pay an amount up to $3.8 million in post-closing earn-outs to Mr. Starr if Centroid achieved certain forecasted performance targets within two years following the closing of this transaction. As expected by all parties to the transaction, Centroid achieved those targets in its first year post-closing. However, contrary to the parties' intent and purpose, Defendant "cooked the books" to disguise the true nature of Centroid's performance, and deprive Mr. Starr of his bargained-for earnings.

84615090_8

## THE PARTIES

3. Plaintiff, Mr. Starr, is a resident of Sea Cliff, New York. He is the former owner of Centroid, a New York corporation.

4. Defendant is a Maine corporation with its place of business in Richmond, Virginia. Through its wholly-owned subsidiaries, Defendant is engaged in the manufacture of components and sub-assemblies for aerospace and defense applications. Defendant purchased Centroid from Mr. Starr pursuant to a stock purchase agreement among Defendant, Mr. Starr, and Centroid, dated as of March 4, 2011 (the "SPA") (a copy of which is annexed as Exhibit A). Defendant is now the owner of all of the issued and outstanding shares of Centroid.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the dispute between the parties pursuant to 28 U.S.C. § 1332(a)(2) because Mr. Starr is a citizen of Sea Cliff, New York, and Defendant is a citizen of Maine and Virginia. The amount in controversy in this action exceeds $75,000.00.

6. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(a)(2), because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of New York.

## GENERAL ALLEGATIONS

### Centroid

7. Centroid is located in Plainview, New York, and has origins dating back to 1949 as part of the operations of the Tensor Electric Development Company ("Tensor"), which began developing sound systems for submarines and components for missiles. Centroid was formed as a separate legal entity in 1965 when it split off from Tensor as sales of the famous Tensor overhead lamp overwhelmed production capacity and the original company was forced to focus its manufacturing efforts on that popular device. At that time, Gerald Starr, then President of

Tensor, acquired Centroid's operations and, since 1965, Centroid has focused solely on the design and manufacture of components for military use. Marc Starr, Gerald Starr's son, took over the reigns of the company in the late 1980s.

8. Centroid is in the aerospace and defense business: manufacturing and assembling electronic and electro-mechanical replacement parts for military applications. Its primary customer is the United States Department of Defense, though Centroid also sells to other original equipment manufacturers such as Lockheed Martin and the Raytheon Company.

9. Centroid's products are used in radar, fire control, and communications systems aboard legacy fixed wing and rotary aircraft, submarines, ships, and ground vehicles.

10. Centroid has been a Silver or Gold "Best Value Medal Winner" for the United States government purchasing offices it serves each year since the mid-1990s.

### Defendant's Acquisition of Centroid

11. In April 2010, Defendant approached Mr. Starr about the possibility of an acquisition. At the time, Mr. Starr was the 100% stockholder of Centroid. Defendant and Mr. Starr negotiated the terms of the SPA, which is governed by Delaware law, and reached a purchase price as set forth in more detail below. The Centroid transaction closed as of March 4, 2011 (the "Closing"), whereupon Centroid became a wholly-owned subsidiary of Defendant.

12. As of the Closing, Centroid had approximately 20 employees, some of whom had been employed by Centroid for over 25 years. At all times since the Closing, Mr. Starr has been and continues to be employed by Defendant.

### Purchase Price Including Post-Closing Earn-Outs

13. Pursuant to the SPA, Defendant agreed to buy all the issued and outstanding capital stock of Centroid from Mr. Starr for (i) $6 million cash, (ii) a working capital adjustment,

(iii) post-Closing interim Earn-Out Payments (the "Interim Earn-Out Payments"), and (iv) a final Earn-Out Payment (the "Final Earn-Out Payment") (items (iii) and (iv) together, "Earn-Outs").

14. The Earn-Out portion of the purchase price was intended to be a mechanism that would provide Mr. Starr with additional consideration if the business of Centroid were to provide Defendant with the performance levels that the parties forecast.

15. Being familiar with Centroid's business, Mr. Starr agreed to forego a total up-front payment and to accept delayed consideration in connection with the sale of Centroid.

16. According to the SPA, the amount due to Mr. Starr in Earn-Outs would be based on the "Earn-Out EBIT", which is defined in the SPA as Centroid's earnings before interest and taxes.

17. In order to determine the amount of Earn-Out EBIT, the SPA required Defendant to prepare and deliver to Mr. Starr special purpose financial statements for each of two 12-month periods ending February 29, 2012 and February 28, 2013 (each, a "Subsequent Financial Statement") in accordance with generally accepted accounting principles ("GAAP"). The purpose of these two Subsequent Financial Statements was to determine whether, in the first two years following the sale of Centroid, it would continue to perform according to Defendant's and Mr. Starr's forecasts.

18. According to the SPA, if Centroid had an Earn-Out EBIT equal to or greater than $1.65 million in each of the 12-month periods following the Closing, Mr. Starr would be entitled to an Interim Earn-Out Payment as set forth in Schedule 2.2(c)(ii) of the SPA, up to a maximum Earn-Out of $1 million per year if the Earn-Out EBIT was equal to or greater than $2 million. If for each of the two 12-month periods following the Closing the Earn-Out EBIT was no less than $1.6 million and the average Earn-Out EBIT for those two 12-month periods was greater than

$2.4 million, Mr. Starr would receive a Final Earn-Out up to a maximum of $1.8 million, for a total Earn-Out of $3.8 million.

19. Under GAAP, financial reports such as the Subsequent Financial Statement are referred to as special-purpose financial statements required to be prepared in connection with an acquisition agreement. Such reports are intended for a specific purpose and for specific users, in this case the Buyer [Defendant] and Seller [Mr. Starr].

20. The Subsequent Financial Statements were to be delivered to Mr. Starr, along with the Earn-Out EBIT calculations, by June 15, 2012 and 2013, respectively. If Mr. Starr disagrees with the contents of a Subsequent Financial Statement, he must send to Defendant a written notice (an "Earn-Out Dispute Notice") within 60 days. However, according to the express terms of the SPA, the only dispute that Mr. Starr may raise with respect to a Subsequent Financial Statement is whether it was prepared in accordance with GAAP.

21. In the event Mr. Starr and Defendant are unable to reach agreement on the figures in the Subsequent Financial Statements, the SPA provides that they are to refer the disputed items to a sole accountant at a nationally or regionally recognized independent accounting firm (the "Accountant"), who shall be directed to resolve the dispute and deliver his/her written determination within 30 days after his/her engagement. According to the SPA, the decision of the Accountant shall be final and "not be subject to judicial review."

Centroid's Performance in the First 12-Month Period Following Closing

22. As expected, Centroid achieved the performance and earnings targets forecast by Defendant and adopted by GBQ Consulting LLC ("GBQ"), the third party valuation expert that Defendant had retained post-Closing in connection with the SPA.

23.     Defendant delivered to Mr. Starr a Subsequent Financial Statement for the 12-month period ended February 29, 2012 together with an Earn-Out EBIT calculation for the same period on June 15, 2012. In spite of Centroid's performance, this first Subsequent Financial Statement purported to show that the Earn-Out EBIT for that period was $1.15 million, an amount less than the $1.65 million threshold necessary for Mr. Starr to receive an Interim Earn-Out Payment.

24.     Had Defendant employed the accounting methods utilized by Centroid, or otherwise, had it merely accurately reported its earnings and expenses, it would have resulted in Earn-Out EBIT of approximately $2.4 million.

25.     Defendant delivered to Mr. Starr a revised Subsequent Financial Statement for the 12-month period ended February 29, 2012 together with an Earn-Out EBIT calculation for the same period on July 11, 2012. In the cover letter attached to the revised Subsequent Financial Statement, Defendant admitted to Mr. Starr that the Subsequent Financial Statement and Earn-Out EBIT calculation that it previously sent to Mr. Starr contained a "material error" in the valuation of Centroid's inventory as of February 29, 2012 and that a revised Subsequent Financial Statement was necessary.

26.     The revised Subsequent Financial Statement was still materially inaccurate as it did not correct a massive misclassification of some $900,000 in profits as expenses and purported to show that the Earn-Out EBIT was $1.09 million, less than the earlier reported Earn-Out EBIT. In any event, the revised Subsequent Financial Statement still showed an Earn-Out EBIT of less than the $1.65 million threshold necessary for Mr. Starr to receive an Interim Earn-Out Payment.

8461500_8

6

27. Based on Mr. Starr's experience, his accumulated knowledge of and familiarity with Centroid's business and his communications with Defendant, he was certain that the Subsequent Financial Statement, purporting to show an Earn-Out EBIT calculation below the threshold necessary for Mr. Starr to receive an Interim Earn-Out Payment, was wrong.

28. Defendant forecast, and GBQ, in its report titled "Intangible Assets Valuation for Centroid" as of March 4, 2011 (the "GBQ Report") (a copy of which is attached hereto as Exhibit B) adopted Defendant's forecast of Centroid's earnings for the years ending February 29, 2012 and February 28, 2013, which forecast used the same method of accounting that Centroid had used pre-Closing.

29. GBQ adopted Defendant's forecast that Mr. Starr would receive the maximum $1 million Interim Earn-Out for each of the 12-month periods ending February 29, 2012 and February 28, 2013.

30. In arriving at the $1 million Interim Earn-Out calculation, Defendant and the GBQ Report did not include any amortization expense.

31. After providing Mr. Starr with the Subsequent Financial Statement, the books and records of Defendant continued to report the obligation for the $1 million Interim Earn-Out Payments to be made to Mr. Starr for each of the 12-month periods ending February 29, 2012 and February 28, 2013.

32. The Subsequent Financial Statement included a $1,324,773 amortization expense of intangible assets that was inconsistent with GAAP in that it failed to reflect the economic substance of the SPA-required Earn-Out calculation and lacked both comparability and

consistency with Centroid's financials prior to its acquisition by Defendant. It also misclassified $900,000 of profits as $900,000 of expenses, which it included in the intangible assets that were amortized.

33. Theresa M. Riddle, the president and chief financial officer of Defendant by email to Mr. Starr dated January 17, 2011 (the "January 17 Email") (a copy of which is annexed hereto as Exhibit C), specifically represented to Mr. Starr that there would not be any post-Closing valuation adjustments related to the inventory acquired at Closing and otherwise assured Mr. Starr that he would make his Earn-Out.

34. Defendant acted contrary to its own representation in the January 17 Email that "Firstmark will use the pre-Closing ending balance sheet as the post-acquisition opening balance sheet so there will be no impact on EBIT going forward of any valuation adjustments made to the inventory as a result of the transaction." Defendant changed the accounting principles used to calculate Earn-Out EBIT for the special purpose financial statement used to calculate the Earn-Out EBIT.

35. The entire $1,324,773 amortization expense taken was incorrectly deducted from earnings for the sole and improper purpose of depriving Mr. Starr of post-Closing Earn-Out Payments.

36. The entire $1,324,773 amortization expense taken was contrary to GAAP.

37. The entire $1,324,773 amortization expense taken contrary to the representations of Defendant as to the accounting methodology to be used.

38. The entire $1,324,773 amortization expense taken was contrary to the GBQ Report that was adopted by Defendant.

39. The largest component of that amortization expense was $900,000 in profits from sales made clearing an order backlog that was wrongfully charged as an expense so that it could be included as amortization expense to reduce Earn-Out EDIT below the threshold necessary for Mr. Starr to receive an Interim Earn-Out Payment.

40. In Centroid's business, orders are generally received for deliveries to be made within the ensuing 12 months. The result of this process inherent in completing an order, is that the preponderance of the next 12 months' sales are "in house" at any moment in time. Therefore, Centroid's order backlog consists of most of the next 12 months' sales.

41. The Interim Earn-Out Payment Mr. Starr expected to receive and that Defendant expected to pay, was based on the profits for the 12-month period following the Closing. At Closing, Centroid's Backlog Report (a copy of which is attached hereto as Exhibit D) demonstrates that as of February 29, 2011, Centroid had approximately $6 million in backlog.

42. Exhibit F to the GBQ Report reflects that GBQ – and Defendant – forecast that the $6 million backlog would produce approximately $900,000 in profits over the next 12-month period.

43. Defendant wrongfully reduced the profits earned during the year ending February 29, 2012 by at least $900,000 which represented profits on sales generated during the year but it which it treated as an expense to be amortized and therefore to reduce Earn-Out EBIT.

44. This deduction was taken for the sole and improper purpose of depriving Mr. Starr of post-Closing Earn-Out Payments.

45. This deduction was never contemplated by either Defendant or Mr. Starr in calculating the Earn-Out.

46. This deduction was not considered in the amount of the Earn-Out Payments calculated by the GBQ Report.

47. This deduction was not a factor in any of the accounting records employed by Centroid prior to Closing.

48. This deduction was contrary to the parties' negotiations, and eliminates a significant portion of the entire first year's profits – which is inconsistent with the purpose of an Earn-Out.

49. By changing the accounting methodology as it did and including an amortization expense in the Subsequent Financial Statement, Defendant also violated GAAP principles, which require that financial statements be consistent and use the same methods to report the same items from period to period to achieve the goal of comparability.

50. The total amortization expense of $1,324,773, of which $900,000 is the largest component, was improperly taken in bad faith, to reduce the Earn-Out EBIT calculation in the Subsequent Financial Statement to $1,150,726 – below the $1.65 million minimum threshold for Mr.Starr to receive an Interim Earn-Out Payment and below the $2 million threshold for Mr. Starr to receive the maximum Interim Earn-Out Payment of $1 million.

51. This $900,000 reduction in the Earn-Out EBIT calculation is so large that that item alone caused Mr. Starr to fail to earn the Interim Earn-Out Payment, even assuming the other expenses and other items reported by Defendant on the Subsequent Financial Statement are accurately reflected.

52. By adding back the $900,000, the Earn-Out EBIT would be increased to $2,050,726, ($1,150,726 plus $900,000) resulting in the maximum Interim Earn-Out Payment to Mr. Starr of $1 million for the period ended February 29, 2012.

53. The Subsequent Financial Statement was prepared by Defendant with the intent of defrauding Mr. Starr out of Earn-Outs (both Interim and Final) totaling as much as $3.8 million.

### The Dispute Resolution Procedure in the SPA Does Not Provide For Resolution of the Issue of Defendant's Duplicity and Bad Faith

54. Pursuant to the SPA, Mr. Starr has until August 14, 2012, which is 60 days from the date Defendant delivered to him the Subsequent Financial Statement, to send Defendant a written notice prepared by an "independent regional or national accounting firm," of his objection to the Subsequent Financial Statement. The only item that Mr. Starr may dispute with respect to the Subsequent Financial Statement is whether the applicable Subsequent Financial Statement was prepared in accordance with GAAP. (SPA Sec. 2.2(c)(iv).)

55. Upon his delivery of an Earn-Out Dispute Notice to Defendant, the parties have 15 days to resolve the matter amicably, and if they are unable to resolve the dispute, they must refer the disputed items to a sole Accountant who shall be directed to resolve the dispute and deliver his/her written determination within 30 days after his/her engagement. The decision of the Accountant shall be final and "not be subject to judicial review." (SPA Sec. 2.2(c)(vii).)

56. The scope of the dispute resolution provision in the SPA pertains solely to the issue of whether the Subsequent Financial Statement was prepared in accordance with GAAP. Mr. Starr's dispute with Defendant is much broader than that. If he is forced to arbitrate the sole issue of whether the Subsequent Financial Statement was prepared in accordance with GAAP, he will be required to institute a wholly separate action with respect to Defendant's duplicity and bad faith in reducing the amount of the EBIT calculation and thereby defrauding Mr. Starr out of Earn-Outs totaling as much as $3.8 million.

57. Having breached the SPA and having acted in bad faith, by (a) "cooking the books" by treating a $900,000 profit as a $900,000 expense, (b) changing the accounting methodology pursuant to which it calculated the Subsequent Financial Statement, (c) failing to prepare the Subsequent Financial Statement in accordance with GAAP, as well as (d) failing to deliver the Subsequent Financial Statement to Mr. Starr in a timely manner, Defendant should not be able to enforce a provision contained in the SPA that directs the parties to resolve before an Accountant the sole issue as to whether the Subsequent Financial Statement was prepared in accordance with GAAP, while leaving unresolved and requiring Mr. Starr to institute a wholly separate action with respect to the issue of Defendant's bad faith in preparing the Subsequent Financial Statement -- an issue that is outside the scope of the limited resolution process contemplated in the SPA.

### As and For Mr. Starr's First Claim for Relief
### (Injunctive Relief)

58. Mr. Starr repeats and realleges each and every allegation set forth in paragraphs 1 through 57 as if fully set forth herein.

59.     The deliberately misstated Subsequent Financial Statement that Defendant delivered on June 15, 2012 was based on an improper "accounting methodology" that took approximately $1.3 million of amortization expense, the largest component of which was $900,000 of profit that it booked as an expense to be amortized, which had the effect of understating the Earn-Out EBIT calculation sufficiently to deprive Mr. Starr of the negotiated consideration he agreed to accept in the SPA as part of the purchase price for Centroid.

60.     The SPA limits Mr. Starr's objection concerning the Subsequent Financial Statement to resolution before a sole Accountant on the sole issue of whether the Subsequent Financial Statement was prepared in accordance with GAAP.  Given the nature of Defendant's actions, this limitation is meaningless, and Mr. Starr's objection would be futile.  Without an injunction, Mr. Starr will be forced to proceed with a dispute resolution process that deprives him of the ability to receive the benefit of the bargain he struck in selling Centroid, and bring a separate action to recover for the Defendant's bad faith and fraud.

61.     Without injunctive relief, Mr. Starr will be irreparably harmed.

62.     If the injunction is not granted, Mr. Starr will be required to institute a wholly separate action with respect to the balance of his claims against Defendant.

63.     Defendant must be enjoined from enforcing the dispute resolution process set forth in the SPA that limits Mr. Starr's objections with respect to the Subsequent Financial Statement to the question of whether it was prepared in accordance with GAAP, and does not address Mr. Starr's other claims against Defendant for breaching the covenant of good faith and fair dealing and for fraud.

### As and For Mr. Starr's Second Claim for Relief
### (Breach of the Covenant of Good Faith and Fair Dealing)

64. Mr. Starr repeats and realleges each and every allegation set forth in paragraphs 1 through 63 as if fully set forth herein.

65. The SPA constitutes a valid and binding agreement between Mr. Starr and Defendant.

66. On or about June 15, 2012, Defendant delivered to Mr. Starr a deliberately misstated Subsequent Financial Statement that based on an improper "accounting methodology" that took approximately $1.3 million of amortization expense, the largest component of which was $900,000 of profit that it booked as an expense to be amortized, which resulted in a calculation of Earn-Out EBIT that deprived Mr. Starr of his rightfully earned Earn-Out Payment.

67. Defendant made the calculations of the Earn-Out EBIT with the intent to avoid its obligations to Mr. Starr under the SPA.

68. Defendant's calculations were prepared to prejudice Mr. Starr's rights and to avoid Defendant's obligations to Mr. Starr under the SPA.

69. Defendant's calculations were prepared in bad faith, and deprived Mr. Starr of the consideration due to him under the SPA.

70. As a direct and proximate result of Defendant's breach of the covenant of good faith and fair dealing in calculating the Earn-Out EBIT, Mr. Starr has suffered damages in an amount to be determined at trial but is not less than $3.8 million.

### As and For Mr. Starr's Third Claim for Relief
### (Fraud)

71. Mr. Starr repeats and realleges each and every allegation set forth in paragraphs 1 through 70 as if fully set forth herein.

72. Defendant knowingly represented to Mr. Starr that earnings of Centroid would be reported post-Closing in the same manner as they had been reported pre-Closing, as a consequence of which, Mr. Starr would receive the Earn-Outs projected in the SPA.

73. Defendant knew at the time it made those representations that they were false and that it would improperly deduct from the Earn-Out EBIT calculation approximately $1.3 million, of which $900,000 is the largest component, so as to reduce Centroid's earnings below the threshold required for Mr. Starr to receive the negotiated Earn-Outs.

74. Mr. Starr relied on Defendant's representations in agreeing to accepting Earn-Outs in lieu of an all cash payment at Closing, and consented to the dispute resolution procedure set forth in the SPA.

75. By adding back the $900,000, the Earn-Out EBIT would be increased, resulting in the maximum Interim Earn-Out Payment of $1 million for the 12-month period ended February 29, 2012.

76. As a consequence, Defendant has deprived Mr. Starr of an Interim Earn-Out Payment for the 12-month period ended February 29, 2012 of $1 million and total Earn-Outs of up to $3.8 million.

[THE REST OF THIS PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, Mr. Starr, demands judgment against Defendant as follows:

(a) Injunctive relief, preventing Defendant from enforcing the dispute resolution process set forth in the SPA;

(b) Damages in an amount to be proved at trial, but not less than $3,800,000;

(c) Any other consequential or other damages to which Mr. Starr may be legally entitled;

(d) All costs, attorneys' fees and expenses incurred by Mr. Starr in connection with this action; and

(e) Such other and further relief as the Court deems just and proper.

Dated: New York, New York
       August 13, 2012

Katten Muchin Rosenman LLP

By: /s/ Meryl Wiener

Steven Eckhaus (SE 1929)
Meryl E. Wiener (MW 3553)
Leah M. Campbell (LC 7456)
575 Madison Avenue
New York, New York  10022
Tel: (212) 940-8860
Fax: (212) 894-5925

*Attorneys for Plaintiff
Marc A. Starr*

16