UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X

MARC A. STARR,

                          Plaintiff,

    -against-

FIRSTMARK CORP.,

                          Defendant.

-------------------------------------------------------- X

FILED
CLERK

2012 AUG 13 PM 2: 31

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

CV 12        4023

FEUERSTEIN, J.

TOMLINSON, M.J.

## MEMORANDUM OF LAW IN SUPPORT
## OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
## WITH TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 2

    Defendant's Acquisition of Centroid.................................................................3

    Purchase Price Including Post Closing Earn-Outs .............................................3

    Centroid's Performance in the First 12-Month Period Following Closing ........................5

    The Subsequent Financial Statement and Amortization Expense Prepared by
    Defendant, Specifically the $900,000 Amortization Expense Was Incorrectly
    Deducted, Was Calculated Based on an Accounting Methodology to Which
    the Parties Had Not Agreed, and Was Not in Accordance With GAAP ...........................6

    The Dispute Resolution Procedure in the SPA Does Not Provide For
    Resolution of the Issue of Defendant's Duplicity and Bad Faith.......................................9

ARGUMENT ....................................................................................................................... 10

I.    Absent Injunctive Relief, Mr. Starr Will Sustain Irreparable Harm................................ 11

II.    Mr. Starr Has Shown a Sufficient Likelihood of Success on the Merits........................... 12

    A.    Mr. Starr is likely to prevail on his claim for fraud ............................................13

    B.    Mr. Starr is likely to prevail on his claim that Defendant breached
        the implied covenant of good faith and fair dealing ............................................14

CONCLUSION.................................................................................................................... 16

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

Chicago Sch. Reform Bd. Of Tr. v. Diversified Pharm. Servs., Inc.,
   40 F. Supp. 2d 987, 996 (N.D. Ill. 1999) ................................................................................12

Citibank, N.A. v. Itochu Int't Inc.,
   No. 01 Civ. 6007(GBD), 2003 WL 1797847 at *5 (S.D.N.Y. Apr. 4, 2003) ...........................14

Eng v. Smith,
   849 F.2d 80, 82 (2d Cir. 1988) ...............................................................................................12

Green Party v. N.Y. State Bd. of Elections,
   389 F.3d 411, 418 (2d Cir. 2004) ...........................................................................................11

Kane v. N.Y. State Nurses Ass'n,
   No. 11 Civ. 6505(RJS), 2011 WL 4862924 at *2 (S.D.N.Y. Oct. 13, 2011) .........................10

Liberty Mut. Ins. Co. v. Blessinger,
   No. 06 CV 391(NGG)(ARL), 2007 WL 951905 at *14 (E.D.N.Y. Mar. 27, 2007)..............13

Maryland Casualty Co. v. Realty Advisory Bd. on Labor Relations,
   107 F.3d 979, 984–85 (2d Cir. 1997) .....................................................................................11

McGaughlin Gormley King Co. v. Terminix Int'l Co., L.P.,
   105 F.3d 1192, 1194 (8th Cir. 1997) ......................................................................................12

Mount Ararat Cemetery v. Cemetery Workers & Greens Attendants Union Local 365,
   975 F. Supp. 445, 446–47 (E.D.N.Y. 1997) ...........................................................................11

Prudential Sec., Inc. v. Mills,
   944 F. Supp. 625, 631 (W.D. Tenn. 1996) ..............................................................................12

Tellium, Inc. v. Coming Inc.,
   No. 03 Civ. 8487, 2004 WL 307238, at *3 (S.D.N.Y. Feb. 13, 2004), reconsideration
   denied, 2004 WL 1403297 (S.D.N.Y. Jun 22, 2004) ..............................................................11

Tom Doherty Assocs. v. Saban Entm't,
   60 F.3d 27, 34 (2d Cir. 1995) .................................................................................................11

## STATE CASES

511 W. 232nd Owners Corp. v. Jennifer Realty Co.,
   98 N.Y.2d 144, 153 (2002) .....................................................................................................14

<u>ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC, C.A.</u>
   No. 5843-VCL, 2012 WL 3027351, at *4 (Del. Ch. Jul. 9, 2012) ...........................................14

<u>Dalton v. Educational Testing Service</u>,
   87 N.Y.2d 384, 389 (N.Y. 1995) .....................................................................................14, 16

<u>Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc.</u>,
   2012 WL 3024000 at *2 (N.Y. App. Div. 2d Dep't Mar. 6, 2007) ..........................................15

<u>Kirke La Shelle Co. v. Paul Armstrong Co.</u>,
   188 N.E. 163, 167 (1933).........................................................................................................16

<u>Pramer S.C.A. v. Abaplus Int'l. Corp.</u>,
   76 A.D.3d 89, 98 (N.Y. App. Div 1st Dep't 2010)...................................................................13

<u>Ross v. Louise Wise Servs., Inc.</u>,
   8 N.Y.3d 478, 488 (N.Y. 2007) ...............................................................................................13

Plaintiff Marc A. Starr ("Mr. Starr" or "Plaintiff") respectfully submits this memorandum of law in support of its motion, pursuant to Fed. R. Civ. P. 65, for a preliminary injunction with temporary restraining order to enjoin and restrain Defendant Firstmark Corp. ("Firstmark" or "Defendant") from enforcing against Mr. Starr a provision in the stock purchase agreement among Centroid, Inc. ("Centroid"), Mr. Starr, and Firstmark dated as of March 4, 2011 (the "SPA") that would require Mr. Starr to arbitrate before a sole accountant his claim that Defendant did not prepare a post-closing financial statement in accordance with generally accepted accounting principles ("GAAP"). Irrespective of whether the post-closing financial statement was prepared in accordance with GAAP, Defendant, acting in bad faith, "cooked the books" by deliberately misstating the post-closing financial statement by at least $900,000 for the sole or improper purpose of depriving Mr. Starr of post-closing earn-out payments of $1 million for the period ended February 29, 2012, and additional earn-out payments over a two year period that could be as much as $3.8 million.

## PRELIMINARY STATEMENT

This motion is to enjoin an unfair dispute resolution process, and to permit Mr. Starr to litigate an action for breach of the covenant of good faith and fair dealing, perpetrated by Defendant against Mr. Starr for the sole purpose of depriving him of the negotiated purchase price for the sale of Centroid, the company built by the Starr family over two generations. As set forth below, Defendant purchased Centroid from Mr. Starr for $6 million in cash at the closing of the SPA (the "Closing"), along with the express promise to pay an amount up to $3.8 million to Mr. Starr after Closing if Centroid hit certain forecasted performance targets within two years. As expected by all parties to the transaction, Centroid hit those targets in its first year. However, contrary to the parties' intent and purpose, Defendant hid the true amount of Centroid's performance, and deprived Mr. Starr of his bargained-for earnings.

As set forth in the Complaint and the Affidavit of Marc A. Starr sworn to on August 10, 2012 (the "Starr Aff.") accompanying this motion, the SPA contains a draconian dispute resolution process for disputing the post-Closing financial statements, which limits Mr. Starr's right to object only to the sole issue of whether Defendant applied GAAP in calculating the earnings in the post-Closing financial statements and does not address other claims of the parties. To compound the unfairness, if Mr. Starr fails to object to the calculations he may be deemed to have waived any objections to Defendant's calculations. Without injunctive relief to prevent enforcement of the very narrow dispute resolution process set forth in the SPA, Mr. Starr either will be deemed to have accepted the improper calculations, and denied his earnings, or to have participated in the dispute resolution process with no ability to seek relief for Defendant's fraud or bad faith unless he institutes a wholly separate action against Defendant.

Accordingly, Mr. Starr applies to this Court for a temporary restraining order ("TRO") and preliminary injunction pursuant to Fed. R. Civ. P. 65. A TRO is critical because the time for Mr. Starr to provide notice to Defendant of his intent to dispute the post-Closing financial statements will expire on August 14, before the Court has an opportunity to pass upon the merits of Mr. Starr's demand for a preliminary injunction.

## STATEMENT OF FACTS

Centroid is located in Plainview, New York and has origins dating back to 1949 as part of the operations of the Tensor Electric Development Company ("Tensor"), which began developing sound systems for submarines and components for missiles. Centroid was formed as a separate legal entity in 1965 when it split off from Tensor as sales of the famous Tensor overhead lamp overwhelmed production capacity and the original company was forced to focus its manufacturing efforts on that popular device. At that time, Gerald Starr, then President of Tensor, acquired Centroid's operations and since 1965, Centroid has focused solely on the

2

design and manufacture of components for military use. Mr. Starr, Gerald Starr's son, took over the reigns of the company in the late 1980s.

Centroid is in the aerospace and defense business: manufacturing, assembling, maintaining, and repairing electronic and electro-mechanical replacement parts for military applications. Its primary customer is the United States Department of Defense, though Centroid also sells to other original equipment manufacturers such as Lockheed Martin and the Raytheon Company.

Centroid's products are used in radar, fire control, and communications systems aboard legacy fixed wing and rotary aircraft, submarines, ships, and ground vehicles. Centroid is typically the sole source or one of a very few sources of the nearly 5,000 different products it manufactures.

### Defendant's Acquisition of Centroid

In April 2010 Defendant approached Mr. Starr about the possibility of an acquisition. At the time, Mr. Starr was the 100% stockholder of Centroid. Defendant and Mr. Starr negotiated the terms of the SPA (a copy of which is annexed to the Starr Aff. As Exhibit A), which is governed by Delaware law, and reached a purchase price as set forth in more detail below. Upon Closing the Centroid transaction, Centroid became a wholly owned subsidiary of Defendant.

As of the Closing, Centroid had approximately 20 employees, some of whom had been employed by Centroid for over 25 years. At all times since the Closing Mr. Starr has been and continues to be employed by Defendant.

### Purchase Price Including Post Closing Earn-Outs

Pursuant to the SPA, Defendant agreed to buy all the issued and outstanding capital stock of Centroid from Mr. Starr for (i) $6 million cash, (ii) a working capital adjustment, (iii) post-Closing interim Earn-Out Payments (the "Interim Earn-Out Payments"), and (iv) a final Earn-

3

Out Payment (the "Final Earn-Out Payment") (items iii and iv together, "Earn-Outs"). The Earn-Outs portion of the purchase price were intended to be a mechanism that would provide Mr. Starr with additional consideration if the business of Centroid were to provide Defendant with the performance levels that the parties forecast. Being familiar with Centroid's business, Mr. Starr agreed to forego a total up front payment and to accept delayed consideration in connection with the sale of Centroid.

According to the SPA, the amount due to Mr. Starr in Earn-Outs would be based on the "Earn-Out EBIT," which is defined in the SPA as Centroid's earnings before interest and taxes. In order to determine the amount of Earn-Out EBIT, the SPA required Defendant to prepare and deliver to Mr. Starr a special purpose financial statements for each of two 12-month periods ending February 29, 2012 and February 28, 2013 (each, a "Subsequent Financial Statement") in accordance with GAAP. The purpose of these two financial statements was to determine whether, in the first two years following the sale of Centroid, it would continue to perform according to Defendant's and Mr. Starr's forecasts.

According to the SPA, if Centroid had an Earn-Out EBIT equal to or greater than $1.65 million in each of the 12-month periods following the Closing, Mr. Starr would be entitled to an Interim Earn-Out as set forth in Schedule 2.2(c)(ii) of the SPA, up to a maximum Earn-Out of $1 million per year if the Earn-Out EBIT was equal to or greater than $2 million. If for each of the two 12-month periods following the Closing the Earn-Out EBIT was no less than $1.6 million and the average Earn-Out EBIT for those two 12-month periods was greater than $2.4 million, Mr. Starr would receive a Final Earn-Out Payment up to a maximum of $1.8 million, for a total Earn-Out of $3.8 million.

4

Financial reports such as the Subsequent Financial Statement are referred to as a special-purpose financial statement "required...to be prepared" in connection with an "acquisition agreement" that is intended for a specific purpose and for specific users – here limited to the use of the Buyer [Defendant] and Seller [Mr. Starr]. The Subsequent Financial Statements were to be delivered to Mr. Starr, along with the Earn-Out EBIT calculations, by June 15, 2012 and 2013, respectively. If Mr. Starr disagrees with the contents of a Subsequent Financial Statement, he must send to Defendant a written notice (an "Earn-Out Dispute Notice") within 60 days. However, according to the express terms of the SPA, the only dispute that Mr. Starr may raise with respect to a Subsequent Financial Statement is whether it was prepared in accordance with GAAP.

In the event Mr. Starr and Defendant are unable to reach agreement on the figures in the Subsequent Financial Statements, the SPA provides that they are to refer the disputed items to a nationally or regionally recognized independent accounting firm (the "Accountant"), who shall be directed to resolve the dispute and deliver his/her written determination within 30 days after his/her engagement. According to the SPA, the decision of the Accountant shall be final and "not be subject to judicial review."

### Centroid's Performance in the First 12-Month Period Following Closing

As expected, Centroid hit the performance and earnings targets forecast by Defendant and adopted by GBQ Consulting LLC ("GBQ"), the third party valuation expert that Defendant had retained post-Closing in connection with the SPA. On June 15, 2012, Defendant delivered to Mr. Starr a Subsequent Financial Statement for the 12-month period ended February 29, 2012 and Earn-Out EBIT calculation for the same period. In spite of Centroid's performance, this first Subsequent Financial Statement purported to show that the Earn-Out EBIT for that period was

5

$1.09 million, an amount less than the $1.65 million threshold necessary for Mr. Starr to receive an Interim Earn-Out.

Had Defendant employed the accounting methods utilized by Centroid pre-Closing, it would have resulted in Earn-Out EBIT of approximately $2.4 million.

**The Subsequent Financial Statement and Amortization Expense Prepared by Defendant, Specifically the $900,000 Amortization Expense Was Incorrectly Deducted, Was Calculated Based on an Accounting Methodology to Which the Parties Had Not Agreed, and Was Not in Accordance With GAAP**

Based on Mr. Starr's experience, his accumulated knowledge of and familiarity with Centroid's business and his communications with Defendant, he was certain that the Subsequent Financial Statement purporting to show an Earn-Out EBIT calculation below the threshold necessary for Mr. Starr to receive an Interim Earn-Out was wrong. Upon closer inspection of the Subsequent Financial Statement, Mr. Starr was correct.

Indeed, Defendant forecast, and GBQ, in its report titled "Intangible Assets Valuation for Centroid" as of March 4, 2011 (the "GBQ Report") (a copy of which is annexed as Exhibit F to the Starr Aff.) adopted Defendant's forecast of Centroid's earnings for the years ending February 29, 2012 and February 28, 2013, which forecast used the same method of accounting that Centroid had used pre-Closing. Moreover, GBQ adopted Defendant's forecast that Mr. Starr would receive the maximum $1 million Interim Earn-Out for each of the 12-month periods ending February 29, 2012 and February 28, 2013. In arriving at the $1 million Interim Earn-Out calculation, Defendant and the GBQ Report did not include any amortization expense. Even after providing Mr. Starr with the Subsequent Financial Statement, the books and records of Defendant continued to report the obligation for the $1 million Interim Earn-Out Payments to be made to Mr. Starr for each of the 12-month periods ending February 29, 2012 and February 28, 2013. The Subsequent Financial Statement included a $1,324,773 amortization expense of

6

intangible assets that was inconsistent with GAAP in that it failed to reflect the economic substance of the SPA-required Earn-Out calculation and lacked both comparability and consistency with Centroid's financials prior to its acquisition by Defendant.

Moreover, Theresa M. Riddle, the president and chief financial officer of Defendant by email to Mr. Starr dated January 17, 2011 (the "January 17 Email,") (a copy of which is annexed to the Starr Aff. as Exhibit H), specifically represented to Mr. Starr that there would not be any post-Closing valuation adjustments related to the inventory acquired at Closing and otherwise assured Mr. Starr that he would make his Earn-Out.

Defendant acted contrary to its own representation in the January 17 Email that "Firstmark will use the pre-Closing ending balance sheet as the post-acquisition opening balance sheet so there will be no impact on EBIT going forward of any valuation adjustments made to the inventory as a result of the transaction." (Starr Aff., Exhibit H.)  Defendant changed the accounting principles used to calculate Earn-Out EBIT for the special purpose form of the calculation (the calculation of Earn-Out EBIT).

The entire $1,324,773 amortization expense taken was incorrectly deducted from earnings for the sole and improper purpose of depriving Mr. Starr of post-Closing Earn-Out Payments, was contrary to GAAP, contrary to the representations of Defendant as to the accounting methodology to be used and contrary to the GBQ Report that was adopted by Defendant.  The largest component of that amortization expense was a $900,000 amortization expense related to the order backlog of Centroid.  In Centroid's business, orders are generally received for deliveries to be made within the ensuing 12 months.  The result of this process inherent in completing an order, is that the preponderance of the next 12 months' sales are "in house" at any moment in time.  Therefore, Centroid's order backlog consists of most of the next

7

12 months' sales. The Interim Earn-Out Payment Mr. Starr expected to receive and that Defendant expected to pay, was based on the profits for the 12-month period following the Closing. At Closing, Centroid's Backlog Report (a copy of which is annexed to the Starr Aff. as Exhibit J) demonstrates that as of February 29, 2011, Centroid had approximately $6 million in backlog. Indeed, Exhibit F to the GBQ Report reflects that GBQ – and Defendant – forecast that the $6 million backlog would produce approximately $900,000 in profits over the next 12-month period. Defendant artificially reduced the profits earned during the year ending February 29, 2012 by at least $900,000, representing profits on sales generated during the year.

This deduction was taken for the sole and improper purpose of depriving Mr. Starr of post-Closing Earn-Out Payments, was never contemplated by either Defendant or Mr. Starr to reflect the Earn-Out, was not considered in the amount of the Earn-Out Payments calculated by the GBQ Report, was not a factor in any of the accounting records employed by Centroid prior to Closing, was contradictory to the parties' negotiations, and eliminates a significant portion of the entire first year's profits – which is inconsistent with the purpose of an Earn-Out, and was rejected by Ms. Riddle in her January 17 Email.

By changing the accounting methodology as it did to include a fabricated amortization expense in the Subsequent Financial Statement, Defendant also violated GAAP principles, which require that financial statements be consistent; meaning, using the same methods to report the same items from period to period to achieve the goal of comparability.

The total amortization expense of $1,324,773, of which the $900,000 is the largest component, was improperly taken in bad faith, so as to reduce the Earn-Out EBIT calculation in the Subsequent Financial Statement to $1,150,726 – below the $1.65 million minimum threshold

8

for Mr. Starr to receive an Interim Earn-Out Payment and, of course, below the $2 million threshold for Mr. Starr to receive the maximum Interim Earn-Out Payment of $1 million.

This $900,000 reduction in the Earn-Out EBIT calculation is so large that that item alone caused Mr. Starr to fail to earn the Interim Earn-Out Payment, even assuming the other expenses and other items reported by Defendant on the Subsequent Financial Statement are accurately reflected – and they are not. By adding back the $900,000, the Earn-Out EBIT would be increased to $2,050,726, ($1,150,726 plus $900,000) resulting in the maximum Interim Earn-Out Payment to Mr. Starr of $1 million for the period ended February 29, 2012.

The Subsequent Financial Statement was prepared by Defendant with the intent of defrauding Mr. Starr out of Earn-Outs (both Interim and Final) totaling as much as $3.8 million.

### The Dispute Resolution Procedure in the SPA Does Not Provide For Resolution of the Issue of Defendant's Duplicity and Bad Faith

Pursuant to the SPA, Mr. Starr has until August 14, 2012, which is 60 days from the date Defendant delivered to him the Subsequent Financial Statement, to send Defendant a written notice prepared by an "independent regional or national accounting firm," of his objection to the Subsequent Financial Statement. The only item that Mr. Starr may dispute with respect to the Subsequent Financial Statement is whether the applicable Subsequent Financial Statement was prepared in accordance with GAAP. (SPA Sec. 2.2(c)(iv).)

Upon his delivery of an Earn-Out Dispute Notice to Defendant, the parties have 15 days to resolve the matter amicably, and if they are unable to resolve the dispute, they must refer the disputed items to a sole Accountant who shall be directed to resolve the dispute and deliver his/her written determination within 30 days after his/her engagement. The decision of the Accountant shall be final and "not be subject to judicial review." (SPA Sec. 2.2(c)(vii).)

9

The scope of the dispute resolution provision in the SPA pertains solely to the issue of whether the Subsequent Financial Statement was prepared in accordance with GAAP. Mr. Starr's dispute with Defendant is much broader than that. If he is forced to arbitrate the sole issue of whether the Subsequent Financial Statement was prepared in accordance with GAAP, he will be required to institute a wholly separate action with respect to Defendant's duplicity and bad faith in reducing the amount of the EBIT calculation and thereby defrauding Mr. Starr out of Earn-Outs totaling as much as $3.8 million.

Having breached the SPA and having acted in bad faith, by (a) "cooking the books" by treating a $900,000 profit as a $900,000 expense, (b) changing the accounting methodology pursuant to which it calculated the Subsequent Financial Statement, (c) failing to prepare the Subsequent Financial Statement in accordance with GAAP, as well as (d) failing to deliver the Subsequent Financial Statement to Mr. Starr in a timely manner, Defendant should not be able to enforce a provision contained in the SPA that directs the parties to resolve before an Accountant the sole issue as to whether the Subsequent Financial Statement was prepared in accordance with GAAP, while leaving unresolved and requiring Mr. Starr to institute a wholly separate action with respect to the issue of Defendant's bad faith in preparing the Subsequent Financial Statement -- an issue that is outside the scope of the limited resolution process contemplated in the SPA.

## ARGUMENT

In the Second Circuit, the standards for a TRO and preliminary injunction are essentially the same. See, e.g. Kane v. N.Y. State Nurses Ass'n, No. 11 Civ. 6505(RJS), 2011 WL 4862924 at *2 (S.D.N.Y. Oct. 13, 2011). To obtain interim injunctive relief, the movant must demonstrate irreparable harm in the absence of the injunction and either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them fair grounds for

litigation and a balance of hardships tipping decisively in the movant's favor. See Green Party v. N.Y. State Bd. of Elections, 389 F.3d 411, 418 (2d Cir. 2004); Tom Doherty Assocs. v. Saban Entm't, 60 F.3d 27, 34 (2d Cir. 1995).

Mr. Starr clearly satisfies the "irreparable harm" prong of this standard. Without the relief requested herein, he will be forced to participate in a dispute resolution procedure that does not address the gravamen of the claims against Defendant. Mr. Starr's consideration for the sale of his business will be eviscerated, and he will have to institute a wholly separate proceeding to recover against Defendant for its bad faith.

Mr. Starr also satisfies the "likelihood of success" prong of this standard. Mr. Starr will likely prevail, since Defendant acted in demonstrable bad faith with the intent to deprive Mr. Starr of his post-Closing Earn-Outs.

## I.
## Absent Injunctive Relief,
## Mr. Starr Will Sustain Irreparable Harm

Injunctions preventing enforcement of dispute resolution clauses due to unfair practices are not new or unusual. Indeed, "compelling arbitration of a matter not properly subject to arbitration constitutes 'per se irreparable harm.'" Tellium, Inc. v. Coming Inc., No. 03 Civ. 8487, 2004 WL 307238, at *3 (S.D.N.Y. Feb. 13, 2004), reconsideration denied, 2004 WL 1403297 (S.D.N.Y. Jun 22, 2004). This principle has been followed by the Second Circuit and District Courts in New York. See Mount Ararat Cemetery v. Cemetery Workers & Greens Attendants Union Local 365, 975 F. Supp. 445, 446–47 (E.D.N.Y. 1997) (finding that a party "may be presumed to suffer irreparable harm if forced to arbitrate a dispute it did not intend to be subject to arbitration"); Maryland Casualty Co. v. Realty Advisory Bd. on Labor Relations, 107 F.3d 979, 984–85 (2d Cir. 1997) (holding that party would be irreparably harmed if compelled to arbitrate an issue that was not arbitrable).

11

The concept that compelled arbitration constitutes irreparable harm is well established and has also been followed in a number of Circuit and District Courts outside the Second Circuit. See, e.g. McGaughlin Gormley King Co. v. Terminix Int'l Co., L.P., 105 F.3d 1192, 1194 (8th Cir. 1997) (compelling arbitration of a possibly non-arbitrable issue is irreparable harm); SEMCO, L.L.C. v. Ellicott Mach. Corp. Int'l., Civ. Action No. 99-1928 Sec. "C" Mag. "5", 1999 U.S. Dist. LEXIS 10710, at *8 (E.D. La. July 9, 1999) (stating that "the wrongful enforcement of an arbitration clause in and of itself constitutes irreparable harm"); Prudential Sec., Inc. v. Mills, 944 F. Supp. 625, 631 (W.D. Tenn. 1996) (holding that forcing a party to arbitrate ineligible claims amounted to irreparable injury); Chicago Sch. Reform Bd. Of Tr. v. Diversified Pharm. Servs., Inc., 40 F. Supp. 2d 987, 996 (N.D. Ill. 1999) (finding that "forcing a party to arbitrate a dispute that it did not agree to arbitrate constitutes per se irreparable harm").

The SPA directs the parties to arbitrate the very narrow issue of whether the Subsequent Financial Statement was prepared in accordance with GAAP. If Mr. Starr is required to arbitrate, he would have to bring a wholly separate action with respect to his broader claims of fraud and breach of the implied covenant of good faith and fair dealing. Accordingly, Mr. Starr has established irreparable harm.

## II.
## Mr. Starr Has Shown a Sufficient
## Likelihood of Success on the Merits

Mr. Starr's claims for relief include fraud, and breach of the covenant of good faith and fair dealing. Where a movant seeks injunctive relief on the basis of likelihood of success, it need only show that the "probability of his prevailing is better than fifty percent." Eng v. Smith, 849 F.2d 80, 82 (2d Cir. 1988) (internal quotations and citations omitted). As set forth below, Mr. Starr is likely to succeed on the merits of his claims for relief for fraud and for breach of the covenant of good faith and fair dealing.

12

A.   **Mr. Starr is likely to prevail on his claim for fraud**

Mr. Starr is likely to succeed in his claim for fraud. Under New York law, a claim for fraud requires a showing of (a) a misrepresentation or material omission of fact which was false and known to be false by the defendant, (b) made for the purpose of inducing the plaintiff to rely upon it, (c) justifiable reliance by the plaintiff on the misrepresentation or material omission, and (d) injury. See e.g. Ross v. Louise Wise Servs., Inc., 8 N.Y.3d 478, 488 (N.Y. 2007); Pramer S.C.A. v. Abaplus Int'l. Corp., 76 A.D.3d 89, 98 (N.Y. App. Div 1st Dep't 2010). Federal Rule of Civil Procedure 9(b) additionally requires that fraud allegations in a complaint must be pleaded with particularity. See e.g. Liberty Mut. Ins. Co. v. Blessinger, No. 06 CV 391(NGG)(ARL), 2007 WL 951905 at *14 (E.D.N.Y. Mar. 27, 2007) (holding that plaintiff had pleaded common law fraud in New York with sufficient particularity to withstand a motion to dismiss).

Mr. Starr has amply set forth the basis for his claim for fraud. During its negotiations to purchase Centroid, Ms. Riddle, Defendant's president and chief financial officer, sent to Mr. Starr financial statements that forecast that Centroid's earning for the two 12-month periods following Closing would be sufficiently high for Mr. Starr to make his Earn-Outs for those years. Indeed, Ms. Riddle specifically told Mr. Starr that "Firstmark will use the pre-Closing ending balance sheet as the post-acquisition opening balance sheet so there will be no impact on EBIT going forward of any valuation adjustments made to the inventory as a result of the transaction." (Starr Aff. 9–10.) Defendant knew its representations were false and "cooked the books" to reduce Centroid's earnings, and, in doing so, deprive Mr. Starr of as much as $3.8 million in Earn-Outs. Defendant accomplished this by deducting from the Earn-Out EBIT calculation the $900,000 profits that were included in Centroid's backlog that existed at the time of Closing. Defendant failed to disclose its intent to Mr. Starr, and Mr. Starr relied on Defendant's

13

representations in consenting both to accepting the Earn-Outs as part of the purchase price, and to limiting his right to dispute the Subsequent Financial Statements to the issue of whether they were prepared in accordance with GAAP.

**B.**    **Mr. Starr is likely to prevail on his claim that Defendant breached the implied covenant of good faith and fair dealing**

The SPA is governed by Delaware law. However, there is no "actual conflict" between the laws governing the implied covenant of good faith and fair dealing in the States of New York and Delaware. Compare ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC, C.A. No. 5843-VCL, 2012 WL 3027351, at *4 (Del. Ch. Jul. 9, 2012) ("[t]he implied covenant requires that a party 'refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of its bargain'") (citations omitted), with Dalton v. Educational Testing Service, 87 N.Y.2d 384, 389 (N.Y. 1995) (finding that the covenant of good faith and fair dealing "requires that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.") (internal citations omitted). Therefore, it is appropriate to view the claim under New York law.

Under New York law, while the duties of good faith and fair dealing do not imply obligations inconsistent with other terms of the contractual relationship, "they do encompass any promises which a reasonable person in the position of the promisee would be justified in understanding were included." 511 W. 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 153 (2002) (internal citations and quotations omitted). Engaging in a misleading accounting plan, even if the plan does not violate the terms of agreement between two parties, can be a violation of the implied covenant of good faith and fair dealing between the parties. See Citibank, N.A. v. Itochu Int't Inc., No. 01 Civ. 6007(GBD), 2003 WL 1797847 at *5 (S.D.N.Y.

14

Apr. 4, 2003) (holding that if plaintiffs relied on defendants' representation that an accounting plan would conform with GAAP and past practices, and defendant's actual accounting plan was contrary to those practices, it could be fairly said that defendants had breached the implied covenant of good faith and fair dealing).

It is Mr. Starr's position that even if the Subsequent Financial Statement prepared by Defendant was technically compliant with GAAP, the Subsequent Financial Statement included an amortization expense of intangible assets in the amount of $1.3 million, which was inconsistent with GAAP in that it failed to reflect the economic substance of the SPA-required Earn-Out calculation and lacked both comparability and consistency with Centroid's financials prior to its acquisition by Defendant, in addition to which it was false. Defendant prepared the Subsequent Financial Statement in this manner for the sole purpose of depriving Mr. Starr of the Earn-Outs that he rightfully should have been paid, to the benefit of Defendant and to the detriment of Mr. Starr. This is a near textbook definition of a breach of good faith. Under New York law, a party may breach an implied duty of good faith and fair dealing even where it has not technically breached its contract, which is precisely what happened in this case. See, e.g. Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc., 2012 WL 3024000 at *2 (N.Y. App. Div. 2d Dep't Mar. 6, 2007) ("Even if a party is not in breach of its express contractual obligations, it 'may be in breach of the implied duty of good faith and fair dealing ... when it exercises a contractual right as part of a scheme to realize gains that the contract implicitly denies or to deprive the other party of the fruit (or benefit) of its bargain'" (internal citations omitted)).

Mr. Starr's agreement to accept delayed consideration in the form of Earn-Outs was built on the premise that Centroid would perform as forecast by Defendant, Centroid's buyer. This expectation was bolstered by Mr. Starr's years of service with Centroid and his accumulated

15

knowledge of and familiarity with Centroid's business. The agreement to accept delayed consideration was not, however, premised on the foundation that Defendant would improperly include an amortization expense that would completely eviscerate Mr. Starr's Earn-Outs. These facts clearly warrant relief under a claim for breach of the covenant of good faith and fair dealing. See Dalton, 663 N.E.2d at 291 ("'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'") (quoting Kirke La Shelle Co. v. Paul Armstrong Co., 188 N.E. 163, 167 (1933)).

## CONCLUSION

For all of the foregoing reasons, Plaintiff Marc A. Starr respectfully requests the Court grant his motion in its entirety.

Dated: New York, New York
       August 13, 2012

                                        Katten Muchin Rosenman LLP

                                        By: _____

                                        Steven Eckhaus (SE 1929)
                                        Meryl E. Wiener (MW 3553)
                                        Leah M. Campbell (LC 7456)
                                        575 Madison Avenue
                                        New York, New York  10022
                                        Tel: (212) 940-8860
                                        Fax: (212) 894-5925

                                        *Attorneys for Plaintiff*
                                        *Marc A. Starr*

16