UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                  :

MARC A. STARR,                             12-CV-4023 (SJF-AKT)

                                :    **REPLY AFFIDAVIT OF SAM**
                  Plaintiff,       **ROSENFARB IN FURTHER SUPPORT**
-against-                          **OF ORDER TO SHOW CAUSE**

                                :

FIRSTMARK CORP.,

                  Defendant.
                                :
------------------------------------------------------------ X

STATE OF NEW YORK       )
                                   ) ss.:
COUNTY OF NEW YORK   )

SAM ROSENFARB, being duly sworn deposes and says:

1. I am the managing director at the independent regional accounting firm Rosenfarb LLC, and I am working with Katten Muchin Rosenman LLP, counsel for Marc A. Starr ("Mr. Starr" or "Plaintiff"), in connection with matters arising out of the dispute between Mr. Starr and Firstmark Corp. ("Firstmark" or "Defendant"). I make this reply affidavit to be read in conjunction with the moving affidavit sworn to by Mr. Starr on August 10, 2012 (the "Moving Affidavit") in support of the order to show cause enjoining Defendant from enforcing a provision in the SPA[1], pursuant to which Mr. Starr sold Centroid to Defendant, which requires Mr. Starr to arbitrate before a sole accountant his claim that Defendant did not prepare a post-Closing financial statement in accordance with GAAP. I have read the affidavit of Theresa M. Riddle

---

[1] Unless otherwise indicated, all abbreviations and definitions will be as set forth in the Moving Affidavit.

sworn to August 24, 2012 in Opposition (the "Opposing Affidavit"), and being fully familiar with the facts set forth below, I make this affidavit in reply.[2]

2. Ms. Riddle's long and selective lecture on ASC 805 regarding the required classification in a business combination of identifiable assets acquired and liabilities assumed (Opposing Affidavit, ¶ 24), entirely side-steps and avoids the single most important fact concerning ASC 805's application to this case--- ASC 805 does not apply to this case. Specifically, ASC 805 does not apply to any acquired company – in this case, Centroid (the "acquiree"), but rather provides authoritative accounting guidance to acquiring companies – in this case, Defendant, Firstmark (the "acquirer"); and ASC 805 requires that the acquirer, not the acquiree, identify, value and record the intangible assets acquired in a business combination. In other words, when Defendant (the "acquirer") acquired Centroid (the "acquiree"), the purchase price was required to be allocated to those specifically identifiable assets that were acquired - and then amortized - and reflected on Defendant's books, and not on Centroid's books. There is no provision in GAAP that would require Centroid, as an acquiree, to record the fair value of any of its assets, nor is there a GAAP requirement for an acquiree to amortize an internally developed intangible asset. Firstmark, as acquirer, is required by GAAP to record the fair value of Centroid's net assets on its consolidated financial statements and to amortize its acquired intangible assets. GAAP distinctly defines "acquirer" and "acquiree" and Ms. Riddle recognizes that "these assets generally are not recorded as assets under GAAP"[3] by an acquiree. Ms. Riddle recognizes that the "accounting for a recognized intangible asset is based on its useful life to the

---

[2] This reply affidavit is meant primarily as a response to the more egregious statements contained in Ms. Riddle's Opposing Affidavit. This does not set forth my entire analysis of, among other things, the post-Closing accounting practices in this matter.

[3] Opposing Affidavit, ¶ 23.

2

reporting entity."[4] The "reporting entity" in this instance is Firstmark, the Defendant, the acquirer - not Centroid, the acquiree. Further, GAAP provides for an acquirer to consolidate its financial statements after acquiring control of an acquiree, and that the consolidated entity – not the acquiree – is the reporting entity. As detailed in the Opposing Affidavit, Defendant attempts to foist the requirement with respect to Defendant's books onto the books of Centroid, and by so doing, drastically and artificially reflects reduced earnings for Centroid in contravention of what apparently were the lengthy negotiations and understanding of the parties (Moving Affidavit, ¶ 16) . The dispute in this matter focuses on Centroid's earnings, not on any component of Defendant's earnings, and certainly not on how Defendant chooses to record Centroid's earnings on Defendant's own books – irrespective of whether the recording on Defendant's books was or was not in compliance with GAAP. The Subsequent Financial Statements that Defendant was required under the SPA to prepare and to use as the basis from which to calculate Centroid's after-sale SPA-defined EBIT and Earn-Outs was to be based on Centroid's financial statements, not Defendant's.

       3.    Ms. Riddle's statements (Opposing Affidavit, ¶ 14) concerning Centroid's inventory, while steeped in the intricacies of ASC 330, are inconsistent with how I am advised inventory was priced at Centroid pre-acquisition. Ms. Riddle states the principle correctly that inventory is reflected as "...the balance of costs applicable to goods on hand remaining after the matching of absorbed costs with concurrent revenues." Inexplicably, however, she misapplies that principle to Centroid's business and accounting practice. I am advised that at year-end, given the highly specialized nature of the goods Centroid produced and the highly specialized design that was made to suit a particular customer, if there were any "leftovers," Centroid

---

[4] Opposing Affidavit, ¶ 26

3

correctly priced the leftover inventory that could not be used at zero – precisely because it could not be used as it could not be assigned to another customer – a practice that is in accordance with GAAP.

4. Mr. Starr advised me that he explained the foregoing practice to Defendant during the parties' negotiations, to make certain that the contemplated EBIT calculation and resulting amount of any Earn-Outs that would be due Mr. Starr would not be affected by any negative impact to Centroid's EBIT caused by pricing leftover, unusable inventory at zero. Despite Ms. Riddle's protestations to the contrary (Opposing Affidavit, ¶ 18), the Moving Affidavit (Moving Affidavit, ¶ 12) indicates that Ms. Riddle assured Mr. Starr that he would make the Earn-Out and that the treatment of inventory would not require any valuation adjustments that would affect EBIT.

5. As stated in the Moving Affidavit (Moving Affidavit, ¶ 15), in Centroid's business, orders are generally received for deliveries to be made within the ensuing 12 months. The result of this process inherent in completing an order is that the preponderance of the next 12 months' sales are "in house" at any moment in time. Therefore, Centroid's order backlog consists of most of the next 12 months' sales. The Interim Earn-Out Payment was to be based on the profits for the 12-month period following the Closing. At Closing, Centroid's Backlog Report (annexed to the Moving Affidavit as Exhibit J) demonstrates that as of February 29, 2011, Centroid had approximately $6 million in backlog. Defendant, through GBQ, determined that the profit embedded[5] in this $6 million in backlog was approximately $900,000. Defendant erroneously deducted this embedded profit, via amortization, from the profits of the year ended February 29, 2012, thereby artificially reducing the Earn-out EBIT. Amortizing the backlog

---

[5] The amount of profit earned upon the completion of the orders.

4

profits of $900,000 (of the entire $1,324,773 amortization expense) over one year is an error. Ms. Riddle is incorrect in her Opposing Affidavit in stating (Opposing Affidavit, ¶ 35) that the $900,000 is "amortization of the intangible asset associated with the unfilled order book Firstmark acquired when it purchased Centroid." These were not "unfilled" orders. This was part of the regular order process of Centroid. Ms. Riddle also is incorrect in stating that the $900,000 of amortization is "completely unrelated to inventory and is not 'profit' that has been misclassified as expense." The $900,000 is the profit estimated by Defendant to be earned on the $6 million of order backlog that existed at Closing. These are the profits that were generated when the $6 million backlog orders were filled during the next year. So given Centroid's order process, by Defendant eliminating the profits generated by the backlog in-house by amortizing it over the next year as Defendant has done, Centroid likely would never record a profit, even though it actually earned a substantial profit. Ms. Riddle fails to consider why, if Centroid likely would not record a profit, anyone, and specifically Mr. Starr, ever would agree to the concept of an Earn-Out whereby part of the purchase price would be dependent on something that could never be achieved – irrespective of whether it was in accordance with GAAP.

6.   As set forth in the Moving Affidavit (Moving Affidavit, ¶ 16), the fact remains, that in determining the $1 million Interim Earn-Out calculation, the parties did not include any amortization expenses. Centroid did not amortize any of its backlog pre-Closing, and that at no time was it suggested that Centroid would do so post-Closing. Whether Defendant's books did, or did not, record amortization expenses, coupled with the effect of that amortization, are not at issue in this litigation. What is at issue is the Earn-Out Payment that Defendant was required to make to Mr. Starr that was to be based on Centroid's earnings – not on Defendant's earnings or how Defendant accounted for Centroid's earnings on Defendant's books.

7. Apparently, Defendant provided GBQ with the amount of the purchase price for the acquisition of Centroid - $6 million cash, approximately $500,000 in working capital, plus it provided GBQ with a schedule of projected earnings from which Earn-Outs of $1 million in each of the two years following Closing were projected. The schedule of forecasted earnings omits <u>any</u> amortization expenses. The fact that Defendant provided GBQ with forecasted earnings to be used in the calculation of the Earn-Out Payments that do not include any amortization expenses, underscores that the accounting methodology that was to be employed by Defendant in calculating the Earn-Out EBIT did not, nor was it intended to, include the erroneous, superfluous and inappropriate amortization expenses that Defendant's used to artificially reduce Centroid's Earn-Out EBIT – amortization expenses that were included without GAAP compliance and in contravention to what I understand to be the agreement of the parties.

8. Indeed, GBQ determined the allocation of the purchase price to the assets acquired by Defendant based on the amounts provided to it by Defendant. Among other items, GBQ allocated $900,000 of the purchase price to Centroid's order backlog, which, based on Defendant's improper amortization over a one year period of its so-called benefit to Defendant, results in the elimination from earnings of the entire $900,000 value of this acquired asset.

9. While GAAP may require that Defendant reflect that amortization on its own books, it is <u>only</u> on Defendant's books where the amortization is required to be reflected, not on the books of Centroid. It is not to be used as a sword to deprive Mr. Starr of the $1 million Earn-Out to which he is entitled based on Centroid's earnings using the accounting methodology that, based on the Moving Affidavit (Moving Affidavit, ¶ 16), was the intention of the parties – a methodology that obviously excluded the imposition of amortization of Centroid's order backlog.

6

10. Despite Ms. Riddle's statement to the contrary (Opposing Affidavit, ¶ 36), amortizing the $900,000 related to Centroid's order backlog was a complete change in the accounting methodology used by Centroid pre-Closing, and, apparently, was neither intended nor agreed to by Mr. Starr. Quite simply, Defendant is trying to miscast the issue here as one of GAAP – or no-GAAP. Even if the Subsequent Financial Statement was prepared in accordance with GAAP, it was prepared based on a changed methodology to which, based on the Moving Affidavit (Moving Affidavit, ¶ 16), Mr. Starr did not agree. Defendant cannot change the accounting methodology and then bind Mr. Starr to an accounting methodology different than the methodology that had been used by Centroid pre-Closing, and different from the methodology to which he had agreed, thereby depriving him of Interim Earn-Outs of as much as $1 million in each of the two years following Closing and a Final Earn-Out of as much as $1.8 million for a total of $3.8 million.

[THE REST OF THIS PAGE INTENTIONALLY LEFT BLANK]

11. Based on the above and on the Moving Affidavit, I respectfully submit this reply affidavit in support of Mr. Starr's request that the Court enjoin Defendant from proceeding with the dispute resolution process in the SPA, which, apparently, Defendant will use to attempt to mask the issues. Defendant should not be allowed to switch its books for that of Centroid, change the accounting methodology without Mr. Starr's knowledge or consent, bind him to that changed methodology and then deprive him of the Earn-Outs to which he otherwise would be entitled.

_____
Sam Rosenfarb

Sworn to before me this
31 day of August, 2012

_____
Notary Public

RONALD G. ROSENFARB
NOTARY PUBLIC - STATE OF NEW YORK
No. 02-RO6249022
Qualified in Queens County
My Commission Expires September 26, 2015

8