UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————X

MARC A. STARR,

                     Plaintiff,

          -against-

FIRSTMARK CORP.,

                     Defendant.

———————————————————————X

FEUERSTEIN, J.

**OPINION & ORDER**
**CV-12-4023 (SJF)(AKT)**
**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★     SEP 0 ° 2013     ★

**LONG ISLAND OFFICE**

I.     Introduction

On August 13, 2012, plaintiff Marc A. Starr ("plaintiff") filed, *inter alia*, a complaint

against defendant Firstmark Corp. ("defendant"), pursuant to this Court's diversity jurisdiction

under 28 U.S.C. § 1332(a)(2), seeking, *inter alia*, to enjoin enforcement of an arbitration

provision in the parties' stock purchase agreement ("SPA") and to recover damages for breach of

the covenant of good faith and fair dealing and fraud. On August 31, 2012, plaintiff filed an

amended complaint asserting two (2) additional claims against defendant seeking damages for

breach of the parties' Employment Agreement dated March 4, 2011 and tortious interference

with a prospective business advantage. On October 18, 2012, plaintiff filed a second amended

complaint ("SAC"). Pending before the Court are: (1) defendant's motion to dismiss the SAC

pursuant to Rule 12(b)(6) for failure to state a claim for relief; and (2) plaintiff's letter motion for

leave to file a third amended complaint. For the reasons set forth herein, defendant's motion is

granted and plaintiff's motion is denied.

1

II.    Background

    A.    Factual Background

Plaintiff is the former owner of Centroid, Inc. ("Centroid"), a New York corporation, (SAC, ¶ 3), which "manufactur[es] and assembl[es] electronic and electro-mechanical replacement parts for military applications, (SAC, ¶ 8). Defendant, through its wholly-owned subsidiaries, manufactures "components and sub-assemblies for aerospace and defense applications." (SAC, ¶ 4).

In April 2010, defendant approached plaintiff about acquiring Centroid. (SAC, ¶ 11). According to plaintiff, in an e-mail dated January 17, 2011, Theresa M. Riddle ("Riddle"), the president and chief financial officer of defendant, "specifically represented to [him] that there would not be any post-Closing valuation adjustments related to the inventory acquired at Closing and otherwise assured [him] that he would make his Earn-Out [payment]." (SAC, ¶ 34, Ex. F). In fact, that e-mail indicated, in pertinent part:

> "There will be no post-acquisition inventory valuation adjustments related to the inventory acquired at Closing. The ending balance sheet (pre-acquisition) will be prepared on a GAAP basis and all adjustments to the valuation necessary to put that balance sheet on a GAAP basis will already be recognized in Centroid's profit prior to Closing (i.e., if the Closing inventory needs to be written up, that write-up will be recognized as a pre-Closing adjustment). [Defendant] will use the pre-Closing ending balance sheet as the post-acquisition opening balance sheet so there will be no impact on EBIT [earnings before interest and taxes] going forward of any valuation adjustments made to the inventory as a result of the transaction. * * *"

(SAC, Ex. F).

Defendant purchased Centroid from plaintiff pursuant to a SPA between plaintiff,

2

Centroid and defendant dated March 4, 2011, (SAC, ¶ 4, Ex. A ["SPA"]), which, by its terms, is governed by and construed in accordance with the laws of the State of Delaware. (SPA ¶ 9.6).

Pursuant to the SPA, defendant agreed to buy all of the issued and outstanding capital stock of Centroid from plaintiff for: (a) a cash payment of six million dollars ($6,000,000.00); (b) post-Closing interim earn-out payments ("IEO payments"); (c) a final earn-out payment ("FEO payment"); and (d) a working capital adjustment. (SPA ¶ 2.2(a)-(d)). According to the SPA, the amount due to plaintiff in IEO payments and for the FEO payment (collectively, "EO payments") would be based upon Centroid's earnings before interest and taxes ("EBIT"). (SPA ¶ 2.2(c)). In order to determine the amount of Centroid's EBIT, the SPA required defendant to prepare and deliver to plaintiff by June 15, 2012 and June 15, 2013, respectively, special purpose financial statements ("Subsequent Financial Statements"), prepared in accordance with generally accepted accounting principles ("GAAP"), for each of two (2) twelve (12)-month periods ending on February 29, 2012 and February 28, 2013. (SAC ¶¶ 17, 20; SPA ¶ 2.2(c)(i)).

On June 15, 2012, defendant delivered to plaintiff a Subsequent Financial Statement for the first twelve (12)-month period ended February 29, 2012, together with an EBIT calculation for that same period, showing an EBIT of $1.15 million, less than the one million six hundred fifty thousand dollar ($1,650,000.00) threshold amount necessary for plaintiff to receive an IEO payment. (SAC, ¶ 23, Ex. B). According to plaintiff, "[h]ad Defendant employed the accounting methods utilized by Centroid, or otherwise, had it merely accurately reported its earnings and expenses, it would have resulted in * * * [an] EBIT of approximately $2.4 million," (SAC, ¶ 24), thereby entitling plaintiff to an IEO payment.

3

On July 11, 2012, defendant delivered to plaintiff a revised Subsequent Financial Statement for the first twelve (12)-month period ended February 29, 2012 ("the First Year Subsequent Financial Statement"), together with an EBIT calculation for that same period, as a result of "a 'material error' in the valuation of Centroid's inventory as of February 29, 2012 * * *." (SAC, ¶ 25, Ex. C).  According to plaintiff, "[t]he revised Subsequent Financial Statement was still materially inaccurate as it did not correct a massive misclassification of some $900,000 in profits as expenses and purported to show that the * * * EBIT was $1.09 million, less than the earlier reported * * * EBIT," (SAC, ¶ 26), and was still below the threshold amount necessary for plaintiff to receive an IEO payment.  (SAC, ¶ 26, Ex. C).  In addition, plaintiff alleges, *inter alia*, that the First Year Subsequent Financial Statement "included a $1,324,773 amortization expense of intangible assets that was inconsistent with GAAP in that it failed to reflect the economic substance of the SPA-required Earn-Out calculation and lacked both comparability and consistency with Centroid's financials prior to its acquisition by Defendant * * * [and] misclassified $900,000 of profits as $900,000 expenses, which it included in the intangible assets that were amortized," (SAC, ¶¶ 33, 37, 40, 44, 45-50), "for the sole and improper purpose of depriving [plaintiff] of post-Closing Earn-Out Payments." (SAC, ¶¶ 36, 45, 51).  Plaintiff further alleges that "[d]efendant acted contrary to its own representation in [Riddle's] January 17 [2011] Email that '[defendant] will use the pre-Closing ending balance sheet as the post-acquisition opening balance sheet so there will be no impact on [Centroid's] EBIT going forward of any valuation adjustments made to the inventory as a result of the transaction[,]' * * * [and] changed the accounting principles used to calculate * * * EBIT for the special purpose financial statement

4

used to calculate the Earn-Out EBIT." (SAC, ¶¶ 35, 38-39). According to plaintiff, the First

Year Subsequent Financial Statement "was prepared by Defendant with the intent of depriving

[him] of Earn-Out[] [Payments] * * * totaling as much as $3.8 million." (SAC, ¶ 54).

       Pursuant to the SPA, if plaintiff disagreed with the contents of the Subsequent Financial

Statements, he was required to send defendant a written notice "prepared by an independent

regional or national accounting firm" ("an EO dispute notice") within sixty (60) days from the

date defendant delivered the Subsequent Financial Statement. (SAC, ¶¶ 20, 55; SPA ¶

2.2(c)(iv)). The only dispute plaintiff can raise with respect to the Subsequent Financial

Statements is whether they were "prepared in accordance with GAAP." (SPA ¶ 2.2(c)(iv)). If

plaintiff failed to deliver the EO dispute notice to defendant within the applicable sixty (60)-day

period, the Subsequent Financial Statement "shall be deemed final and correct and shall be

binding upon each of the Parties." (SPA ¶ 2.2(c)(v)).

       Pursuant to paragraph 2.2(c)(vii) of the SPA ("the arbitration provision"), in the event the

parties are unable to reach an agreement on the figures in the Subsequent Financial Statements

within fifteen (15) days of plaintiff's EO dispute notice, (SPA ¶ 2.2(c)(vi)), they are required to

refer the disputed items "to a nationally or regionally recognized independent accounting firm

that performs audits of companies of similar size or larger than [Centroid] and that is acceptable

to both [plaintiff and defendant] ("the Independent Accountant")," who shall resolve the dispute

and deliver a written determination thereof within thirty (30) days after his or her engagement.

(SAC, ¶¶ 21, 56; SPA ¶ 2.2(c)(vii)). The arbitration provision of the SPA expressly provides that

the Independent Accountant's decision "shall be final and binding upon the Parties and shall not

be subject to judicial review." (SAC, ¶¶ 21, 56; SPA ¶ 2.2(c)(vii)). According to plaintiff, "[t]he scope of the [arbitration] provision in the SPA pertains solely to the issue of whether the Subsequent Financial Statement was prepared in accordance with GAAP." (SAC, ¶ 57). Plaintiff alleges, however, that his "dispute with Defendant is much broader than that and includes Defendant's bad faith in reducing the amount of the EBIT calculation and thereby depriving [him] of Earn-Outs totaling as much as $3.8 million." (SAC, ¶ 57).

By letter dated August 16, 2012, defendant, with whom plaintiff was employed until March 2013 pursuant to an employment agreement dated March 4, 2011, (SAC, ¶¶ 12, 62), advised him that it was placing him "'on leave with full pay and benefits effective immediately until the earlier of the conclusion of the litigation or the expiration of [his] employment agreement," in light of the allegations in plaintiff's complaint of bad faith and fraud on the part of defendant. (SAC, Ex. I). Defendant demanded that plaintiff return to it his keys to the office, the building, his desk and his file cabinets, as well as any confidential information concerning Centroid in his possession, and instructed plaintiff "'not to enter upon Centroid's property or engage in any contact with Centroid's customers, vendors or employees * * *." (SAC, ¶ 61, Ex. I). According to plaintiff, defendant suspended him "in order to ruin Centroid's revenue prospects and thereby deprive him of his Earn-Out [payments], and [to] relieve Defendant of any obligation to pay [him] the Earn-Out [payments] based on Centroid's performance." (SAC, ¶ 64). Plaintiff alleges that since he "is the primary person responsible for sales at Centroid, and his performance in that sales capacity is essential for Centroid's continued success in its business, * * * [b]y placing [him] on leave and preventing him from working, Defendant, in effect, is

preventing Centroid from achieving the $2 million earnings for the 12-month period ending February 28, 2013." (SAC, ¶¶ 65-66, 76-78).

### B.     Procedural Background

On August 13, 2012, plaintiff filed, *inter alia*, a complaint against defendant pursuant to this Court's diversity jurisdiction under 28 U.S.C. § 1332(a)(2), seeking, *inter alia*, to enjoin enforcement of the arbitration provision in the parties' SPA and to recover damages for breach of the covenant of good faith and fair dealing and fraud.

On August 31, 2012, plaintiff filed an amended complaint against defendant asserting five (5) claims for relief seeking: (1) to enjoin enforcement of the arbitration provision in the SPA (first claim for relief); and (2) damages for breach of the covenant of good faith and fair dealing (second claim for relief), fraud (third claim for relief), tortious interference with prospective business advantage (fourth claim for relief) and breach of contract, i.e., the Employment Agreement (fifth claim for relief).

On October 18, 2012, plaintiff filed a second amended complaint ("SAC") asserting two (2) claims for relief seeking damages for breach of the covenant of good faith and fair dealing relating to the First Year Subsequent Financial Statement (first claim for relief) and Second Year Subsequent Financial Statement (second claim for relief). Plaintiff alleges that defendant "breached the SPA by acting in bad faith, by (a) treating a $900,000 [nine hundred thousand dollar] profit as a $900,000 [nine hundred thousand dollar] expense, (b) changing the accounting methodology pursuant to which it calculated the [First Year] Subsequent Financial Statement, (c)

7

failing to prepare the [First Year] Subsequent Financial Statement in accordance with GAAP, as well as (d) failing to deliver the [First Year] Subsequent Financial Statement to [him] in a timely manner." (SAC, ¶¶ 58, 69-70). According to plaintiff, "Defendant's calculations were prepared in bad faith, * * * deprived [him] of the consideration due to him under the SPA[,] [and] were prepared to prejudice [his] rights and to avoid Defendant's obligations to [him] under the SPA." (SAC, ¶¶ 71-72). In his first claim for relief, plaintiff alleges that defendant violated the covenant of good faith and fair dealing implied in the SPA by making "the calculations of the Earn-Out EBIT [in connection with the First Year Subsequent Financial Statement] with the intent to avoid its obligations to [him] under the SPA." (SAC, ¶ 73).

In his second claim for relief, plaintiff alleges that defendant violated the covenant of good faith and fair dealing "by destroying Centroid's ability to reach performance targets for the year ending February 28 2013 * * *," (SAC, ¶ 79), thereby affecting his second year IEO and FEO payments.

Defendant now moves to dismiss the SAC pursuant to Rule 12(b)(6) for failure to state a claim for relief and plaintiff moves for leave to file a third amended complaint.


III.    Discussion

A.    Standard of Review

The standard of review on a motion made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167

L.Ed.2d 929 (2007).  The pleading of specific facts is not required; rather a complaint need only give the defendant "fair notice of what the * * * claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting Twombly, 550 U.S. at 555, 127 S.Ct. 1955).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557, 127 S.Ct. 1955).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. 544, 127 S.Ct. at 1959.  The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.

In deciding a motion pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. See McGarry v. Pallito, 687 F.3d 505, 510 (2d Cir. 2012); Rescuecom Corp. v. Google Inc., 562 F.3d 123, 127 (2d Cir. 2009).  However, this tenet "is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. 662, 129 S.Ct. at 1949.  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 1950; see also Ruston v. Town Board for Town of Skaneateles, 610 F.3d 55, 59 (2d Cir. 2010) ("A court can choose to begin by identifying pleadings that, because they are

9

no more than conclusions, are not entitled to the assumption of truth." (quotations and citations

omitted)).  Nonetheless, a plaintiff is not required to plead "specific evidence or extra facts

beyond what is needed to make the claim plausible." Arista Records, LLC v. Doe 3, 604 F.3d

110, 120-1 (2d Cir. 2010); see also Matson v. Board of Education of City School District of New

York, 631 F.3d 57, 63 (2d Cir. 2011) ("While a complaint need not contain detailed factual

allegations, it requires more than an unadorned, the defendant-unlawfully-harmed-me

accusation." (internal quotations and citation omitted)).

The Court must limit itself to the facts alleged in the complaint, which are accepted as

true; to any documents attached to the complaint as exhibits or incorporated by reference therein;

to matters of which judicial notice may be taken; or to documents upon the terms and effect of

which the complaint "relies heavily" and which are, thus, rendered "integral" to the complaint.

Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002) (citing International

Audiotext Network, Inc. v. American Tel. and Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995)); see also

L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 422 (2d Cir. 2011).


B.    Implied Covenant of Good Faith and Fair Dealing

Under Delaware law, which it is undisputed is applicable to plaintiff's claims, the

covenant of good faith and fair dealing attaches to every contract and "is best understood as a

way of implying terms in [an] agreement, whether employed to analyze unanticipated

developments or to fill gaps in the contract's provisions." Dunlap v. State Farm Fire and

Casualty Co., 878 A.2d 434, 441 (Del. 2005) (quotations and citations omitted); see also Nemec

v. Shrader, 991 A.2d 1120, 1125 (Del. 2010) ("The implied covenant of good faith and fair

dealing involves a cautious enterprise, inferring contractual terms to handle developments or

contractual gaps that the asserting party pleads neither party anticipated.") "Existing contract

terms control, however, such that implied good faith cannot be used to circumvent the parties'

bargain, or to create a free-floating duty unattached to the underlying legal document." Dunlap,

991 A.2d at 1125 (quotations, alterations and citation omitted); see also Kuroda v. SPJS

Holdings, L.L.C., 971 A.2d 872, 888 (Del. Ch. 2009) ("[R]ather than constituting a free floating

duty imposed on a contracting party, the implied covenant can only be used conservatively to

ensure the parties' reasonable expectations are fulfilled." (quotations and citations omitted)).

Thus, a claim for breach of the implied covenant of good faith and fair dealing generally cannot

be based upon "conduct authorized by the agreement." Nemec, 991 A.2d at 1125-26 (quoting

Dunlap, 878 A.2d at 441). "At the same time, the covenant exists to fulfill the reasonable

expectations of the parties, and thus the implied obligation must be consistent with the terms of

the agreement as a whole." Airborne Health, Inc. v. Squid Soap, LP, 984 A.2d 126, 146 (Del.

Ch. 2009). "The doctrine thus operates only in that narrow band of cases where the contract as a

whole speaks sufficiently to suggest an obligation and point to a result, but does not speak

directly enough to provide an explicit answer." Id.

 The covenant of good faith and fair dealing will only serve to imply contract terms when

the party asserting it establishes that the other party to the contract "has acted arbitrarily or

unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably

expected." Nemec, 991 A.2d at 1126; see also Dunlap, 878 A.2d at 441. "Thus, parties are

liable for breaching the covenant when their conduct frustrates the overarching purpose of the contract by taking advantage of their position to control implementation of the agreement's terms." Dunlap, 878 A.2d at 441 (quotations and citation omitted). Courts "must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal." Nemec, 991 A.2d at 1126; see also Airborne, 984 A.2d at 146 ("[T]he implied covenant is not a means to re-write agreements.") To state a claim for breach of the implied covenant of good faith and fair dealing under Delaware law, the plaintiff "must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff," Kuroda, 971 A.2d at 888 (quotations and citation omitted), i.e., "some injury to [the plaintiff's] contractual interest as a result of the breach of the implied obligation." Id. at 888-89. "General allegations of bad faith conduct are not sufficient. Rather, the plaintiff must allege a specific implied contractual obligation and allege how the violation of that obligation denied the plaintiff the fruits of the contract." Id. The "quasi-reformation" of a contract occasioned by implying a covenant of good faith and fair dealing to its terms "should be a rare and fact-intensive exercise, governed solely by issues of compelling fairness." Dunlap, 878 A.2d at 441 (quotations, alterations and citation omitted); see also Kuroda, 971 A.2d at 888 ("Consistent with its narrow purpose, the implied covenant is only rarely invoked successfully.")

"[W]hen a contract confers discretion on one party, the implied covenant of good faith and fair dealing requires that the discretion– such as [an acquiror's] discretion in controlling [an acquired business] after the [acquisition] and during the earn-out period– be used reasonably and

in good faith." Winshall v. Viacom International, Inc., 55 A.3d 629, 638 (Del. Ch. 2011); see

also Airborne, 984 A.2d at 146-47.

Nonetheless, the implied covenant of good faith and fair dealing only applies to

developments that could not be anticipated at the time of contracting, "not developments that the

parties simply failed to consider * * *." Nemec, 991 A.2d at 1126; see also Dunlap, 878 A.2d at

441 ("Only when it is clear from the writing that the contracting parties would have agreed to

proscribe the act later complained of had they thought to negotiate with respect to that matter

may a party invoke the covenant's protections." (quotations, alterations and citation omitted));

Winshall, 55 A.3d at 636-37 ("The court must be mindful that the implied covenant of good faith

and fair dealing should not be applied to give plaintiffs contractual protections that they failed to

secure for themselves at the bargaining table.  In other words, the implied covenant is not a

license to re-write contractual language just because the plaintiff failed to negotiate for

protections that, in hindsight, would have made the contract a better deal." (quotations and

citation omitted)).  Moreover, "[t]he implied covenant will not infer language that contradicts a

clear exercise of an express contractual right." Nemec, 991 A.2d at 1127.  "A party does not act

in bad faith by relying on contract provisions for which that party bargained where doing so

simply limits advantages to another party." Id. at 1128.  "Delaware's implied duty of good faith

and fair dealing is not an equitable remedy for re-balancing economic interests after events that

could have been anticipated, but were not, that later adversely affected one party to a contract.

Rather the covenant is a limited and extraordinary legal remedy." Id.

1.    First Claim for Relief

Plaintiff's first cause of action based upon the First Year Subsequent Financial Statement fails to state a plausible claim for breach of the implied covenant of good faith and fair dealing under Delaware law because, *inter alia*, plaintiff does not allege a "specific *implied* contractual obligation," Kuroda, 971 A.2d at 888 (emphasis added), purportedly breached by defendant. Unlike the hypothetical in Winshall, plaintiff's dispute is not with defendant's conduct in controlling Centroid during the Earn-Out period, e.g., there is no allegation that defendant took any action to negatively affect Centroid's earnings during the Earn-Out period. Rather, plaintiff disputes the accounting methodologies employed by defendant to calculate Centroid's EBIT in preparing the First Year Subsequent Financial Statement. (See SAC, ¶¶ 69-74). The SPA speaks directly on this issue, i.e., it required defendant to prepare Subsequent Financial Statements "in accordance with GAAP," (SPA, ¶ 2.2(c)(i)), as well as on the issues of what plaintiff could challenge with respect to the way the Subsequent Financial Statements were prepared, i.e., it provides that "[t]he only item that may be disputed [t]hereunder is whether the applicable Subsequent Financial Statement was prepared in accordance with GAAP," (SPA, ¶ 2.2(c)(iv)), and how plaintiff was to raise and proceed with any such dispute, (SPA, ¶¶ 2.2(c)(iv)-(vii)).

Moreover, plaintiff does not, and cannot, allege that "neither party anticipated," Nemec, 991 A.2d at 1125, disputes with the way the Subsequent Financial Statements were prepared. Moreover, that the parties could have even anticipated the specific issue of what accounting methodology defendant used to calculate Centroid's EBIT in preparing the Subsequent Financial Statements at the time of contracting is evidenced by Riddle's e-mail sent to plaintiff

approximately two (2) months prior to the parties execution of the SPA.  Plaintiff could have

insisted on the inclusion of language in the SPA to the effect that defendant employ the

accounting methods previously utilized by Centroid prior to the Closing, or employ a specific

accounting method upon which the parties mutually agreed, yet he failed to do so.  Instead,

plaintiff agreed to authorize defendant to prepare the Subsequent Financial Statements in

accordance with GAAP and now, in hindsight, regrets his failure to insist on the inclusion of

more specific language regarding the accounting methodology to be used by defendant in

calculating Centroid's EBIT to prepare the Subsequent Financial Statements.  Plaintiff is, in

effect, improperly seeking a contractual protection that he failed to secure for himself when

negotiating the SPA.  Moreover, since defendant's conduct in preparing the First Year

Subsequent Financial Statement in accordance with GAAP[1] was authorized by the SPA, plaintiff

cannot state a plausible claim for breach of the implied covenant of good faith and fair dealing

based upon the accounting methods utilized by defendant to calculate Centroid's EBIT in

preparing the First Year Subsequent Financial Statement.  Accordingly, the branch of defendant's

motion seeking dismissal of plaintiff's first claim for relief pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure is granted and plaintiff's first claim for relief is dismissed in its

entirety with prejudice for failure to state a claim for relief.

---

[1] The parties proceeded to arbitration on the issue of whether the Subsequent Financial
Statement was prepared in accordance with GAAP as required by the SPA.  During a July 15,
2013 conference before me, counsel advised that the arbitration award was in favor of defendant.
In his letter motion seeking leave to file a third amended complaint, plaintiff concedes that the
Independent Accountant selected by the parties concluded that the First Year Subsequent
Financial Statement was prepared in accordance with GAAP.

2.      Second Claim for Relief

Plaintiff's second cause of action based upon the potential effect the suspension of his employment may have on his Second Year IEO payment also fails to state a plausible claim for breach of the implied covenant of good faith and fair dealing under Delaware law because, *inter alia*, plaintiff does not allege, or cannot establish: (1) a "specific implied contractual obligation," Kuroda, 971 A.2d at 888, purportedly breached by defendant; (2) that defendant acted arbitrarily or unreasonably in suspending his employment; or (3) that he has suffered any injury to his contractual interests under the SPA.

To the extent plaintiff contends that the SPA imposed an implied contractual obligation requiring defendant to refrain from interfering in any way with his employment at Centroid during the term of the Employment Agreement contemplated by Section 5.5 of the SPA[2], such an implied obligation is not "consistent with the terms of the [SPA] as a whole." Airborne, 984 A.2d at 146. No language in the SPA either expressly or impliedly infers that plaintiff's work at Centroid until February 28, 2013 was contemplated by the parties as essential to the performance of the SPA. Indeed, the parties' obligations with respect to plaintiff's employment at Centroid are set forth in a separate Employment Agreement. Thus, the covenant of good faith and fair dealing cannot be employed to imply any obligation upon defendant with respect to plaintiff's employment at Centroid.

---

[2] Section 5.5 of the SPA provides: "At the Closing, [plaintiff] shall enter into an employment agreement with [Centroid], at a salary of $350,000 per year, having a term of two (2) years from the Closing Date, which employment agreement shall be in the form attached hereto as Exhibit E * * *."

Moreover, plaintiff cannot establish that defendant acted "arbitrarily or unreasonably" in suspending his employment. Although plaintiff conclusorily alleges that defendant "deliberately" suspended his employment "for the sole purpose" of depriving him of the Earn-Out payments, (SAC, ¶ 77), the August 16, 2012 letter from defendant advising plaintiff of the suspension, which is attached to the complaint, indicates that plaintiff's employment was suspended "with full pay and benefits * * * until the earlier of the conclusion of the litigation or the expiration of [plaintiff's] employment agreement" based upon the charges plaintiff asserts against defendant and its directors and officers in this litigation.

Furthermore, plaintiff does not allege that he has suffered any injury to his contractual interest in Earn-Out payments under the SPA as a result of the suspension of his employment. Plaintiff alleges only that without his work, it is "a virtual certainty that Centroid will not meet," (SAC, ¶ 76), the earnings threshold that would entitle him to Earn-Out payments. Nowhere does the SAC allege that Centroid in fact failed to meet the earnings threshold for the twelve (12)-month period ending February 28, 2013, or that plaintiff did not receive the Second Year IEO or FEO payments.[3]

Moreover, plaintiff's speculative contention that his absence from work will likely affect the earnings threshold is contradicted by his other allegation in the SAC that "the preponderance

---

[3] In fact, in his proposed third amended complaint, plaintiff alleges that without certain purportedly improper expenses being applied to the Second Year Subsequent Financial Statement's Earn-Out calculations, i.e., an amortization expense, legal fees and accounting expenses, "Centroid's Second Year Earn-Out EBIT would be well above the amount required for [plaintiff] to be paid a maximum Second Year Interim Earn-Out." (TAC, ¶ 72). Thus, plaintiff's suspension clearly did not affect Centroid's EBIT or, in turn, his Second Year IEO payment. Indeed, plaintiff omits this claim in the proposed third amended complaint.

of the next 12 months' sales are 'in house' at any moment in time.  Therefore, Centroid's order backlog consists of most of the next 12 months' sales." (SAC, ¶ 41).  Taking that allegation as true, any work that plaintiff would have performed at Centroid between the date of his suspension, i.e., August 16, 2012, and the end of the second twelve (12)-month period on February 28, 2013 would have had little, if any, effect on Centroid's EBIT or, in turn, plaintiff's anticipated Second Year IEO or FEO payments.

For all of the foregoing reasons, the branch of defendant's motion seeking dismissal of plaintiff's second claim for relief in the SAC pursuant to Rule 12(b)(6) of the Federal Rules of Procedure is granted and plaintiff's second claim for relief is dismissed with prejudice for failure to state a claim for relief.

### C.      Leave to Amend

In a letter motion addressed to the Honorable A. Kathleen Tomlinson, United States Magistrate Judge, plaintiff requests leave to file a third amended complaint ("TAC") "to include events and facts that have occurred since the filing of the [SAC]."[4]

Although Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a party shall be given leave to amend "when justice so requires," leave to amend is not required where a proposed amendment would be futile.  Hill v. Curcione, 657 F.3d 116, 123-24 (2d Cir. 2011); see also Grullon

---

[4] Although motions to amend filed in cases assigned to me are generally handled by the magistrate judge assigned to the case, and despite the fact that plaintiff's letter motion was not filed in accordance with Magistrate Judge Tomlinson's individual rules, for the sake of efficiency, I will address the motion.

18

v. City of New Haven, 720 F.3d 133, 140 (2d Cir. 2013). "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure." Panther Partners Inc. v. Ikanos Communications, Inc., 681 F.3d 114, 119 (2d Cir. 2012).

In the proposed TAC, plaintiff alleges, *inter alia*, that on June 21, 2013, defendant delivered to him the Second Year Subsequent Financial Statement for the twelve (12)-month period ended February 28, 2013, together with an Earn-Out EBIT calculation for the same period, which showed that Centroid's earnings were below the threshold for him to be paid the Second Year IEO payment. (TAC, ¶ 59). Plaintiff challenges the Second Year Subsequent Financial Statement on the grounds that it contains: (1) "large amounts of purported expenses that were organized into broad and undefined categories that were not included in the First Year [Subsequent Financial] Statement," thereby "dramatically decreas[ing] Centroid's Earn-Out EBIT, placing the EBIT below the threshold required for [him] to receive an Earn-Out payment," (TAC, ¶ 60); (2) "a massive amortization expense charged to Centroid's books," (TAC, ¶ 61); and (3) defendant's purported legal and accounting expenses related to this action as an expense on Centroid's balance sheet, (TAC, ¶¶ 65-66). According to plaintiff, when the amount of those purportedly improper expenses is credited to Centroid's stated Second Year Earn-Out EBIT, it "would be well above the amount required for [him] to be paid a maximum Second Year Interim Earn-Out [payment]." (TAC, ¶ 72). Plaintiff, thus, seeks to assert a claim seeking damages for breach of the implied covenant of good faith and fair dealing in connection with defendant's preparation of the Second Year Subsequent Financial Statement.

Plaintiff also seeks to assert claims seeking damages and a declaratory judgment related to defendant's purported manipulation of Centroid's invoices system. The proposed TAC alleges that "[a]t the time of the Closing, Centroid was in possession of six (6) unpaid invoices in accounts receivable that had aged over 90 days ("Excluded Accounts Receivable"), and those invoices were noted in SPA Schedule 3.22(c)."[5] (TAC, ¶ 74). Each of those six (6) Excluded Accounts Receivable "represented a particular order that Centroid's customers had placed with Centroid, and which Centroid had fulfilled." Id. Section 5.6 of the SPA provides that "[i]n the event that, after the Closing Date, [Centroid or defendant] shall receive payment of any Excluded Accounts Receivable, *the recipient* shall promptly deliver such payment to [plaintiff]." (Emphasis added).

Plaintiff alleges that after the Closing, "Defendant issued new invoices with new invoice numbers to replace the invoices listed in SPA Schedule 3.22(c)." (TAC, ¶ 75). "Those invoices contained identical amounts, and represented orders that were identical to the invoice numbers contained in SPA Schedule 3.22(c)." Id. According to plaintiff, he has not received payment, and defendant denies that it owes him payment, for two (2) of the six (6) Excluded Accounts Receivable, i.e., invoice numbers 7338C and 8340, totaling sixteen thousand two hundred ninety dollars and thirty cents ($16,290.30). (TAC, ¶¶ 76-77). Plaintiff alleges that "Defendant asserts

---

[5] Section 3.22(c) of the SPA provides: "Except as set forth in Schedule 3.22(c), [Centroid] has not, since February 28, 2010, declared, set aside or paid any dividend or other distribution of cash, property or other assets in respect of its ownership interests. For purposes of clarification, Schedule 3.22(c) sets forth those accounts receivable of [Centroid] which, as of the Closing Date, are or would be older than ninety (90) days and which have been distributed to [plaintiff] prior to the Closing Date (the 'Excluded Accounts Receivable')."

it is not obligated to pay [him] the amount of $16,290.30" because Centroid received payment on

the replacement invoices, as opposed to invoice numbers 7338C and 8340. (TAC, ¶ 78).

Plaintiff's first claim for relief in the TAC is virtually identical to the first claim for relief

in the SAC which, for the reasons set forth above, fails to state a plausible claim for relief. Thus,

that claim in the proposed TAC is futile.

Plaintiff's second claim for relief in the proposed TAC is based upon defendant's

preparation of the Second Year Subsequent Financial Statement. Like the first claim for relief,

plaintiff's second cause of action fails to state a plausible claim for breach of the implied

covenant of good faith and fair dealing under Delaware law because, *inter alia*, plaintiff does not

allege a "specific *implied* contractual obligation," Kuroda, 971 A.2d at 888 (emphasis added),

purportedly breached by defendant.[6] Rather, plaintiff challenges only certain expenses defendant

---

[6] Plaintiff also claims that defendant violated the covenant of good faith and fair dealing
by "sabotaging good faith efforts by [him] to verify the accuracy of the Second Year [Subsequent
Financial] Statement," (TAC, ¶ 93), i.e., by providing "late and incomplete" responses to his
requests for supporting documentation, (TAC, ¶ 91), only eleven (11) days prior to the end of the
Earn-Out Dispute Period, (TAC, ¶ 63), and "induc[ing] [him] to prepare a list of additional
supporting documents and records, and then promptly refusing [his] request," (TAC, ¶ 92).
Section 2.2(c)(iv) of the SPA provides, in relevant part, that "[d]uring the [sixty (60) day] Earn-
Out Dispute Period, [plaintiff] and his representatives shall be permitted to review (during
normal business hours and upon reasonable notice) the books and records and working papers of
[Centroid and defendant] relating to the Subsequent Financial Statement and calculation of Earn-
Out EBIT." Section 2.2(c)(vi) of the SPA provides, in relevant part, that "[i]f [plaintiff] delivers
an Earn-Out Dispute Notice to [defendant] during the Earn-Out Dispute Period, [plaintiff and
defendant] shall for a period of fifteen (15) days from the date the Earn-Out Dispute Notice is
delivered to [defendant] (the 'Resolution Period'), use their respective commercially reasonable
efforts to resolve amicably the items in dispute * * *." Since the SPA speaks directly on the
issue of the parties' obligations during the Earn-Out Dispute Period and Resolution Period,
plaintiff cannot base his breach of the implied covenant of good faith and fair dealing claim upon
defendant's purported breach of those obligations. In any event, plaintiff has not alleged any
injury to his contractual interests under the SPA resulting from defendant's conduct during the
Resolution Period and cannot establish any injury to his contractual interest under the SPA

included in calculating Centroid's EBIT to prepare the Second Year Subsequent Financial Statement. (See TAC, ¶¶ 88-90, 93-4). As with the First Year Subsequent Financial Statement, plaintiff alleges no conduct by defendant in controlling Centroid that negatively affected Centroid's EBIT during the second year ending on February 28, 2013. Since, as noted above with respect to plaintiff's first claim for relief in the SAC, the SPA speaks directly on the issue, *inter alia*, of how defendant is to prepare the Subsequent Financial Statements, (SPA, ¶ 2.2(c)(i)), plaintiff has not alleged any *implied* contractual obligation upon which to base a claim for breach of the covenant of good faith and fair dealing with respect to the Second Year Subsequent Financial Statement.[7] Accordingly, plaintiff's second claim for relief in the prposed TAC is futile.

Plaintiff's third claim for relief in the proposed TAC alleges that defendant breached the covenant of good faith and fair dealing by withholding payments due him for Excluded Accounts Receivable. (TAC, ¶¶ 96-97). Like plaintiff's first two (2) claims for relief in the proposed TAC, his third claim for relief fails to state a plausible claim for breach of the implied covenant

---

resulting from defendant's conduct during the Earn-Out Dispute Period. Indeed, the only possible injury that could have resulted from defendant's conduct during the Earn-Out Dispute Period would be plaintiff's inability to deliver an Earn-Out Dispute Notice within the sixty (60) day period provided by the SPA. Since plaintiff alleges that he was able to review the supporting documents and timely submit an Earn-Out Dispute Notice within the Earn-Out Dispute Period, (TAC, ¶¶ 64, 68), he cannot establish any injury resulting from defendant's conduct during that period, notwithstanding his conclusory allegation that defendant's conduct "prevent[ed] [him] from fully verifying the accuracy of the Second Year [Subsequent Financial] Statement * * *," (TAC, ¶ 94).

[7] As noted in a prior order dated October 12, 2012, any claim challenging a Subsequent Financial Statement as not having been prepared in accordance with GAAP is covered by a valid and binding arbitration agreement in the parties' SPA and, therefore, cannot proceed in this Court.

of good faith and fair dealing under Delaware law because, *inter alia*, it does not allege a "specific *implied* contractual obligation," Kuroda, 971 A.2d at 888 (emphasis added), purportedly breached by defendant. Since the SPA speaks directly on the issue of payments for Excluded Accounts Receivable, (SPA, ¶ 5.6), plaintiff has not alleged any *implied* contractual obligation with respect to defendant's purported conduct in failing to make those payments.

Moreover, plaintiff names only Firstmark as a defendant in this action, not Centroid, yet plaintiff alleges that it was Centroid that received payment on the replacement invoices. (TAC, ¶¶ 78, 100). Since the SPA requires "the recipient" of any payment on an Excluded Accounts Receivable to "promptly deliver such payment to [plaintiff]," (SPA, ¶ 5.6), the proposed TAC fails to allege any breach by defendant of its obligations, express or implied, under the SPA. Thus, plaintiff's third claim for relief, as well as his fourth claim for relief seeking a declaratory judgment with respect to defendant's obligations under the SPA, in the proposed TAC are futile.[8]

Since all of plaintiff's claims in the proposed TAC fail to state a plausible claim for relief, plaintiff's letter motion seeking leave to file the proposed TAC is denied.

## III.   CONCLUSION

For the foregoing reasons, defendant's motion seeking dismissal of plaintiff's second

---

[8] Moreover, defendant represents: (1) that plaintiff's third and fourth claims for relief in the proposed TAC are related to a pending state court action commenced by defendant against plaintiff; and (2) that plaintiff is in possession of the sixteen thousand two hundred ninety dollars and thirty cents ($16,290.30) he seeks in his third claim for relief in the proposed TAC, insofar as he withheld that amount from money he owes defendant for reimbursement of the independent accountant's fees and costs pursuant to Section 2.2(c)(vii) of the SPA.

amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted and plaintiff's second amended complaint is dismissed in its entirety with prejudice, and plaintiff's letter motion seeking leave to file a third amended complaint pursuant to Rule 15(a) of the Federal Rules of Civil Procedure is denied. The Clerk of the Court shall enter judgment in favor of defendants and close this case.

SO ORDERED.

s/ Sandra J. Feuerstein

_____
Sandra J. Feuerstein
United States District Judge

Dated: September 9, 2013
      Central Islip, New York